[No. 42030-5-I.    Division One.    September 20, 1999.]

THE STATE OF WASHINGTON, *Appellant*, v. VINCENT LEE
BRYANT, *Respondent*.

*Norm Maleng, Prosecuting Attorney*, and *Barbara A. Mack, Deputy*, for appellant.

*David A. Trieweiler*; and *Andrew Louis Subin*, for respondent.

AGID, A.C.J. — After the State granted Vincent Bryant contractual use and derivative use immunity in exchange for information about a series of residential burglaries, it charged him with several of the same crimes, arguing they were based on independent evidence. Bryant moved to

dismiss the charges and, after the required *Kastigar* hearing, the trial court dismissed counts 21-37 and 42, finding that they were "neither independent of [Bryant's] immunized testimony nor would [they] have inevitably been discovered." *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). In a related finding, the trial court determined that Bryant's codefendant Jeffrey Dorman was derived as an evidentiary source from Bryant's statements and excluded his testimony on counts 17-20. The State appeals the dismissal of counts 21-37 and 42, the suppression of Dorman's testimony, and the trial court's suppression of a confession Bryant made at his sentencing hearing on an unrelated burglary. Bryant cross appeals, arguing that all the charges against him should be dismissed. We conclude that the trial court erred in characterizing the State's use of the evidence as a nonevidentiary derivative use and dismissing the counts on that basis. But we reach the same result based on the contract between Bryant and the State. We hold that the State's evidentiary use of Bryant's statements to obtain evidence against him violates the derivative use prohibition of the use immunity agreement and affirm the trial court.

## FACTS

In late 1993 and early 1994, detectives suspected Vincent Bryant, Jeffrey Dorman, and Willie King of participating in a series of armed home invasion robberies which occurred along the I-5 corridor. But because the suspects wore masks and gloves and blindfolded their victims, investigators had no eyewitness identification, fingerprints, or other physical evidence to conclusively link the suspects to the crimes.

In early 1995, Bryant absconded from Snohomish County. He was apprehended in Mississippi in January 1996. In February 1996, he tried to initiate contact with a Mercer Island detective who had investigated the I-5 robberies. Because the detective was no longer with Mercer Island, Bryant was referred to James Hardtke of the Fraud Division. Hardtke accompanied King County Detective Steve

Tucker to meet with Bryant. When they met, Bryant told them that because he had already been sentenced, he had no reason to give them any information. He later changed his mind and called Hardtke from the jail, indicating that he wanted to talk. He also requested that prosecutor Alan Garrett be at the interview. On March 27, 1996, Bryant met with Tucker, Garrett, and Hardtke to discuss the unsolved robberies. In exchange for information, the State entered into a "use and derivative use" immunity agreement with Bryant. Under this agreement, he spoke with police and prosecutors four times between March 27, 1996 and October 7, 1996. Bryant claims the information he provided allowed the State to continue investigations which, by the State's own admission, had "languished" for lack of evidence.

In October 1996, the State encouraged local police detectives and the Puget Sound Violent Crimes Task Force to resume their investigations of the robberies. Shortly thereafter, investigators reinitiated contact with Jeffrey Dorman, to whom they had already spoken several times without success. The detectives told Dorman they were prepared to file charges against him for his involvement in the robberies, but they neither told him that Bryant had cooperated nor disclosed any facts or information Bryant had relayed. This time Dorman agreed to cooperate and entered into an immunity agreement under which he gave several lengthy interviews detailing the facts of the crimes.

Based on the information Bryant and Dorman supplied, the State charged Bryant, Dorman, King, and David Israel with conspiracy and multiple counts of robbery and kidnapping. Prior to trial,[1] Bryant moved to dismiss the charges against him on the theory that the State could not establish that he was being prosecuted independently of statements he made under the immunity agreement. After a lengthy evidentiary hearing at which the court considered all files and notes accumulated by the State and the police agencies involved, the trial court determined that the State

---

[1] The trial court severed Bryant's trial from the other defendants' trials.

had made improper nonevidentiary use of Vincent Bryant's immunized testimony to charge him with counts 21-37 and 42 and dismissed those charges.[2] As for counts 17-20,[3] which related to a Mercer Island robbery, the court found that "the prosecution has established by a preponderance of evidence, independent sources of evidence, and evidence that would inevitably have been discovered notwithstanding Bryant's cooperation . . . ." But the court excluded Dorman's testimony on these counts on the basis that he was not an independent source. The trial court also determined that Bryant's confession, made in the course of a sentencing hearing on an unrelated residential burglary offense, was protected by the immunity agreement.

## DISCUSSION

The trial court dismissed counts 21-37 and 42 against Bryant because they derived from the State's improper use of Bryant's immunized testimony to "focus the investigation, make decisions to initiate prosecution, interpret other evidence, and plan trial strategy." It concluded that these uses were "nonevidentiary" and prohibited both under the immunity agreement and by the Ninth Circuit's *United States v. Dudden*[4] decision. The State contends that the trial court has misinterpreted "use and derivative use" immunity, arguing that "[n]othing remotely suggests that [Bryant's] statements cannot be used to reinterpret pre-existing evidence, to investigate other suspects, to focus the investigation, or to be used in other nonevidentiary ways." The State believes that by barring nonevidentiary uses of Bryant's testimony, the trial court has imparted an unjustifiably broad scope to use and derivative use im-

---

[2]Counts 1-16 were previously dismissed because they occurred in Cowlitz or Snohomish counties. The dismissed charges include nine counts of first degree robbery with a deadly weapon, seven counts of first degree kidnapping, and one count of indecent liberties.

[3]These counts included two counts each of first degree kidnapping and first degree robbery with a deadly weapon.

[4]65 F.3d 1461 (9th Cir. 1995).

munity, given Bryant a "windfall," and left the State "in a worse position than it would have been in had it never spoken to Bryant."

■ To compel a witness to give up his Fifth Amendment privilege against self-incrimination and testify,[5] a prosecutor may offer a defendant various types of contractual or statutorily-authorized grants of immunity from prosecution. Although immunity issues typically arise when a defendant refuses to testify before a grand jury or court on Fifth Amendment grounds, the government "can grant the defendant varying degrees of immunity in an informal agreement."[6] The parties agree that the State's agreement with Bryant, which provided that nothing Bryant revealed could "ever be used against [him] in any prosecution," or "utilized by law enforcement to find additional evidence" to use against him, granted Bryant contractual use and derivative use immunity. The parties disagree about what types of government uses of immunized testimony a grant of use and derivative use immunity prohibits.

■ "Use immunity," by itself, prohibits only direct use of a defendant's compelled statements against him in a later criminal trial. Use immunity is not as comprehensive as transactional immunity,[7] which prohibits prosecution for any matter about which the witness testified or given a statement; i.e., the entire transaction. It is likewise less comprehensive than the Fifth Amendment privilege against self-incrimination because "it does not preclude the derivative use of the fruits of the compelled testimony as investigatory leads which might supply other means of in-

---

[5]The Fifth Amendment to the United States Constitution directs that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[6]*Dudden*, 65 F.3d at 1467. Because Bryant's constitutional right against self-incrimination was not implicated, and because use and derivative use immunity is not statutorily authorized in Washington, Bryant's agreement should be interpreted using "ordinary contract principles." *Id.*

[7]Transactional immunity is statutorily authorized in Washington. *See* RCW 10.27.130.

criminating the witness."[8] "Derivative use immunity," however, does bar the State from using any evidence derived from immunized statements to "furnish a link in the chain of evidence needed to prosecute the claimant . . . ."[9] Derivative use immunity is often granted in conjunction with use immunity because use and derivative use immunity together provide protection which is "coextensive" with the Fifth Amendment privilege.[10] In essence, use and derivative use immunity leave the witness, and the government, in the same situation they would have been in had the witness not given a statement or testified.[11]

■ In *Kastigar v. United States*, the United States Supreme Court characterized use and derivative use immunity as a "total prohibition on use" which "provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."[12] Such immunity prohibits "prosecutorial authorities from using the compelled testimony in *any* respect . . . ."[13] Under *Kastigar*, the government may still prosecute a witness for a crime to which the immunized testimony relates. But if the witness challenges the source of the government's evidence, the prosecution bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."[14]

---

[8]*Eastham v. Arndt*, 28 Wn. App. 524, 529, 624 P.2d 1159, *review denied*, 95 Wn.2d 1028 (1981).

[9]*Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 818, 95 L. Ed. 1118, 1124 (1951).

[10]*See Kastigar v. United States*, 406 U.S. 441, 453, 92 S. Ct. 1653, 1661, 32 L. Ed. 2d 212 (1972).

[11]*Id.* at 462.

[12]*Id.* at 460 (citation omitted).

[13]*Id.* at 453.

[14]*Id.* at 461-62.

In *United States v. McDaniel*,[15] the Eighth Circuit interpreted *Kastigar* as prohibiting all "nonevidentiary" use of immunized testimony by the prosecution, even though the use did not generate evidence considered at trial.[16] *McDaniel* defined nonevidentiary use as "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy"[17] and concluded that each of these actions and decisions is barred under use and derivative use agreements. The *McDaniel* court reasoned that because *Kastigar* "proscribed 'any use, direct or indirect . . . ,' "[18] it must therefore "forbid all prosecutorial use of the testimony, not merely that which results in the presentation of evidence before the jury."[19] Several courts have followed the Eighth Circuit's lead and have concluded that the government may not use immunized statements "to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy."[20]

But another line of cases views *McDaniel* and its progeny as exceeding the scope of *Kastigar* and blurring "the realistic difference between transactional immunity and use immunity . . . ."[21] In *United States v. Byrd*, the Eleventh Circuit recognized that "*Kastigar* made no men-

---

[15]482 F.2d 305, 311 (8th Cir. 1973).

[16]Nonevidentiary uses are those "that do not furnish a link in the chain of evidence against the defendant." Gary S. Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment*, 66 Tex. L. Rev. 351, 353 (1987).

[17]482 F.2d at 311.

[18]*Id.* at 311 (quoting *Kastigar*, 406 U.S. at 460).

[19]*Id.* at 311.

[20]*Dudden*, 65 F.3d at 1467. *See also United States v. Harris*, 973 F.2d 333, 337 n.2 (4th Cir. 1992); *United States v. North*, 910 F.2d 843 (D.C. Cir.), *modified*, 920 F.2d 940, 122 A.L.R. Fed. 771 (D.C. Cir. 1990), *cert. denied*, 500 U.S. 941 (1991).

[21]*United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988) (declining to follow the reasoning used in other circuits that would "foreclose the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and

tion of any burden on the government to erect an impenetrable barrier between the prosecutors who hear or read the immunized testimony . . . .[22] It accordingly held that *Kastigar* requires only that the prosecution of an immunized defendant be based on independent sources; the government is not required to "negate all abstract 'possibility' of taint."[23] We agree that in order to determine whether the State violated the terms of Bryant's use and derivative use agreement, the appropriate inquiry is not whether the investigators knew of or thought about his statements, but rather whether the government actually used Bryant's statements to build a case against him.

### I. The State's Use of Bryant's Statements

After the required *Kastigar* hearing, the trial court found that "despite the best efforts of law enforcement working separately and together as a joint task force, that these cases were closed as unsolved or, at best, inactive and unsolved for over two years prior to defendant's March 27, 1996 giving of immunized testimony." Testimony at the *Kastigar* hearing supported this finding. The State asserts that "[d]uring the course of investigating [the Everett] robbery, Everett Detective Stephen Kiser learned about Bryant and Dorman's association, their recent purchases of cars, their pager and phone numbers, and their addresses" and "came to believe that Bryant, Dorman, and King had committed the . . . robbery." At the *Kastigar* hearing, however, Kiser testified that although he had suspected that Bryant was involved in the Everett robbery, he "didn't

---

preparing for trial . . . ."), *cert. denied*, 490 U.S. 1011 (1989). *See also United States v. Byrd*, 765 F.2d 1524, 1531 (11th Cir. 1985); *United States v. Serrano*, 870 F.2d 1, 17-18 (1st Cir. 1989).

[22]*United States v. Byrd*, 765 F.2d 1524, 1530 (11th Cir. 1985).

[23]*Id.* at 1529. In *United States v. Crowson*, the Ninth Circuit similarly stated that " '[t]he focus of the inquiry under *Kastigar* . . . is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.' " 828 F.2d 1427, 1430 (9th Cir. 1987) (quoting *United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986), *cert. denied*, 483 U.S. 1021 (1987)), *cert. denied*, 488 U.S. 831 (1988).

feel [the evidence he had collected] was enough evidence to be sent to the prosecutor." Kiser further testified that a Snohomish county prosecutor had reviewed the evidence against Bryant and told him "she didn't think there was enough there. She didn't use those probable cause words, but she told me . . . she didn't think it was enough." Kiser's testimony about the Everett robbery is representative. Although Bryant and Dorman were prime suspects in the I-5 robberies as early as 1993, the State did not believe it had sufficient evidence to charge them with the crimes before Bryant's four interviews. These interviews conclusively established that Bryant, Dorman, King and Israel had committed the crimes and supplied details about each of them.

After these discussions, Detectives Nelson and Erickson approached Dorman in October 1996[24] and told him they planned to charge him with a string of home invasion robberies. Erickson told Dorman he would not "walk" and that he would not get immunity for murder, arson, or rape, but that he could get more favorable treatment if he cooperated with the investigation. Dorman first declined to talk to them because he "thought they were . . . fishing," but "[s]omething in the conversation made [him] think." He changed his mind and initiated a meeting with the detectives to "find out what was going on." Dorman testified that no one told him at the first meeting what evidence the detectives had and he could not tell from the investigators' questions that anyone had cooperated. Even after the second interview in November 1996, Dorman had "no idea somebody was cooperating" with the investigators.[25] When asked why he agreed to cooperate, Dorman consistently responded that he "believe[d] that there were sexual assaults committed that [he] had nothing to do with" and he

---

[24]Investigators had approached Dorman twice in 1994, but he refused to cooperate at that time.

[25]Dorman further testified that when he and Bryant were in the holding tank together at their arraignment, that he "didn't know that [Bryant] had made a statement to the police and [Bryant] didn't know that [Dorman] had made a statement to police."

wanted to make sure that he would not be charged with a crime he did not commit.

The trial court found that "Vincent Bryant's multiple sessions with law enforcement were the linchpin or proximate cause of law enforcement re-opening the closed or inactive investigative files" and that "[l]aw enforcement talks with Jeff Dorman only progressed in November 1996 after Bryant gave detailed information on all of the robberies, where and how they occurred and who was involved." The court found it "hard to believe that armed with that information they didn't paint Dorman in such a corner that he figured, you know, he had no alternative but to begin . . . to cooperate."[26]

The State argues that the mere fact that its contacts with Dorman occurred after Bryant's interviews does not itself prove that Dorman was not an independent source. The State is correct.[27] But that does not end the inquiry. The State did not meet its burden of proving that talks with Dorman would have progressed without Bryant's cooperation. The record supports the trial court's conclusion that the evidence the State had gathered against Bryant in 1993 and 1994 was not sufficient to bring charges against him and that, until Bryant agreed to speak, investigation of these crimes was stalled. And although neither Dorman nor his attorney was aware that Bryant had cooperated until months after the charges were filed, substantial evidence in the record supports the trial court's finding that Dorman "as an evidentiary source, was derived directly from Vincent Bryant's immunized testimony." Dorman would not have agreed to testify if the State had not acquired sufficient evidence to charge him with the crimes. The State was able to tell Dorman they were going to charge him only because Bryant's testimony reopened the investigation and gave it sufficient evidence to charge Dor-

---

[26]Because substantial evidence in the record supports this finding, it is a verity on appeal. *See State v. Broadaway*, 133 Wn.2d 118, 130, 942 P.2d 363 (1997).

[27]*See United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir.), *cert. denied*, 516 U.S. 1014 (1995).

man. Bryant's statements allowed the State to reinitiate contact with Dorman, a previously identified suspect who had previously refused to talk. It was only because the State was in fact able to bring charges against him that Dorman talked. The State was able to make that a viable threat only because of what it had learned from Bryant.[28]

■■ Therefore, we must conclude that the State used Bryant's testimony as an "investigatory lead,"[29] which is an evidentiary use specifically prohibited by the terms of his immunity agreement. As the Fourth Circuit noted in *United States v. Harris*, "[i]t is not legitimate for the government to alter its investigatory strategy as a result of the immunized statement."[30] Even though the State knew of Dorman's involvement before Bryant volunteered information and did not disclose the fact or substance of Bryant's cooperation to witnesses or potential suspects, Bryant's cooperation allowed the State to obtain evidence from Dorman against Bryant which Dorman had previously refused to give. Bryant's statements did not merely "influence the prosecutor's thought processes" at the trial phase. They furnished a critical link in the chain of evidence used to charge all the defendants, including Bryant, with the robberies. Because derivative uses are explicitly prohibited by Bryant's immunity agreement, the trial court appropriately dismissed the charges which were not supported by independent evidence and excluded Dorman's statements on the remaining charges. Although the trial court based its dismissal of counts 21-37 and 42 on an erroneous legal conclusion that the State made impermissible *nonevidentiary* uses of Bryant's testimony, we can affirm on any

---

[28]We must reject the State's argument that Dorman's testimony about his motives for cooperating severely undermine the trial court's findings. Implicit in the court's findings is a credibility determination about Dorman's testimony which we will not disturb on appeal. *State v. McCrorey*, 70 Wn. App. 103, 114, 851 P.2d 1234 (1993).

[29]*United States v. Harris*, 973 F.2d 333, 337 (4th Cir. 1992).

[30]*Id*. at 336.

grounds supported by the record.[31] Counts 21-37 and 42 were based on evidence derived from Bryant's statements. Because the State neither established independent sources for the evidence it relied on to prosecute Bryant on those counts nor showed how that evidence would have inevitably been discovered, it did not discharge its "heavy burden" of proof.

## II. Bryant's Confession at an Unrelated Sentencing Hearing

The State next contends that Bryant's confession to the robberies charged in this case at an unrelated sentencing hearing is admissible independent evidence because it was not covered or anticipated by his immunity agreement. Before a January 3, 1997 hearing on an unrelated residential burglary, Bryant's attorney and the prosecutor agreed to explain Bryant's assistance in the State's investigation of the robberies at issue in this case to argue for an exceptional sentence for the crime. The prosecutor stated that she would admit that "[Bryant] had been helpful, enormously helpful." At the hearing, Bryant's attorney argued that because he had provided "a great deal of assistance and cooperation . . . giving information about a great number of very serious crimes . . . ," he deserved an exceptional sentence.

To make this argument, Bryant and his attorney disclosed the details of the robberies and the immunity agreement. As Bryant's attorney explained, "we couldn't have had [the prosecutor] telling the Judge that he's been helpful and have it have any content that would be significant to an exceptional sentence below the range without disclosing the facts to the Judge." On these facts, the trial court found that:

Bryant's statements to Judge John Darrah on January 3, 1997,

---

[31]*See State v. Norlin*, 134 Wn.2d 570, 582, 951 P.2d 1131 (1998). The State also contends that "the trial court erred in concluding that the State could not use Bryant's statements to investigate others," but the clerk's papers to which it cites do not indicate that the trial court made that ruling. We therefore do not rule on the issue.

. . . were protected by the immunity agreement of March 27, 1996. . . . The immunity agreement mandated that defendant be candid and truthful. Defendant's cooperation was to be acknowledged by the prosecutor before Judge Darrah. Defendant's admissions to Judge Darrah paralleled his immunized statements and will not render null and void the immunity bargained for at some risk to his and his family's safety.

This is an accurate finding. The record establishes that there was an agreement which allowed Bryant and his attorney to disclose facts about the robberies so the sentencing court could determine the extent of his cooperation with the State. Using this information against Bryant would, we agree, render the terms of his immunity agreement "null and void."

### III. Bryant's Cross Appeal

On cross appeal, Bryant asserts that all the counts against him should be dismissed because (1) no evidence independent of his statements supports counts 17-20, (2) the State used Bryant's statements in the certification for determination of probable cause, and (3) the State materially breached the immunity agreement.[32]

The trial court found that "as to counts 17-20, the Mercer Island robbery, the prosecution has established by a preponderance of evidence, independent sources of evidence, and evidence that would inevitably have been discovered notwithstanding Bryant's cooperation, that are wholly separate and apart from Bryant's immunized testimony . . . ." We will uphold these findings unless they are clearly erroneous.[33]

Jonathan Crane, a Mercer Island detective, testified that

---

[32]Bryant also alleges that the trial court erred by denying him full access to the record of the special inquiry proceeding. Because Bryant failed to bring a motion for review of this issue within the 30 days required by RAP 5.2(b) and has failed to offer a reason why this time limitation should be extended, we will not consider this argument.

[33]*Crowson*, 828 F.2d at 1429.

Bryant approached Crane in 1994 to ask for immunity in exchange for information. When Crane asked him if he committed the crime, he told Crane that "he had done it on Mercer Island." This statement, made well before the 1996 immunity agreement, when viewed in conjunction with evidence from other independent witnesses linking Bryant to the Mercer Island crime, offers substantial support for the trial court's conclusion that the Mercer Island charge was based on independent evidence.

Bryant also argues that "the deputy prosecuting attorney who conducted the immunized interviews drafted and signed the certification supporting the information, and included therein a significant amount of material derived from Bryant's immunized statements." At the *Kastigar* hearing, the trial court thoroughly analyzed the evidence underlying each count to determine whether the charges were barred by Bryant's immunity agreement. It found independent "sources of evidence sufficient to support the Certification for Determination of Probable Cause charging defendant Bryant with the Mercer Island robbery, counts 17-20." Including material derived from Bryant's statements in the certification does not change the fact that the charges themselves are based on and can be proven by independent evidence. Any improper statements in the certification can be removed and a new certification filed prior to trial.

■ Bryant also alleges that because the State breached its immunity agreement, all charges against him should be dropped. The trial court correctly concluded that the State "honored the spirit and letter" of the immunity agreement. The State brought its charges against Bryant on the assumption that they were supported by independent evidence and elected not to charge Bryant with a number of other crimes to which he confessed. Its good faith attempt to adhere to the terms of the agreement cannot be deemed a breach.

Because counts 21-37 and 42 were impermissibly derived from Bryant's immunized statements and counts 17-20

were based on independent evidence, we affirm the trial court's dismissal of the derivative counts and reject Bryant's cross appeal.

Affirmed.

BAKER and ELLINGTON, JJ., concur.

Reconsideration denied January 20, 2000.

Review denied at 140 Wn.2d 1026 (2000).