243

THE STATE OF WASHINGTON, *Respondent*, v. WILLIE JAMES KING,
*Appellant*.

THE STATE OF WASHINGTON, *Appellant*, v. DAVID R. ISRAEL, ET
AL., *Respondents*.

244

246

248

250

*Willie J. King*, pro se.

*Gregory M. Miller*, for defendant King.

*James E. Lobsenz* (of *Carney, Badley, Smith & Spellman*), for defendant Israel.

*Norm Maleng, Prosecuting Attorney*, and *Barbara A. Mack, Deputy*, for the State.

COLEMAN, J. — David Israel and Willie King challenge their convictions arising out of a string of home-invasion robberies that occurred in the early 1990s.[1] King was tried alone and convicted in 1997 of one of the robberies, as well as for assaulting and taking indecent liberties with the robbery victim. King's 1997 conviction and certain testimony elicited during that trial were introduced as evidence in a subsequent joint trial of Israel and King for conspiracy, robbery, and kidnapping.

In the 1999 joint trial, the State alleged that King and two other men engaged in a number of home-invasion robberies and then sold jewelry taken from those homes to

---

[1] These appeals were linked for oral arguments and are consolidated for purposes of this opinion due to a number of shared issues and overlapping facts.

Israel at his pawnshop. The State alleged that Israel knew about the robberies, assured the robbers that the police would not be involved, asked for specific items from them, and gave them directions on one occasion to the house of family friends who he knew had expensive jewelry. At trial, Israel claimed that he did not know the jewelry was stolen until one of the robbers threatened to harm him and his family when he tried to refuse to buy the jewelry. According to Israel, he did not knowingly buy stolen jewelry after that, but he did eventually pay one of the men to leave him alone. The jury convicted Israel and King as charged.

After trial, Israel moved for a new trial based on newly discovered evidence. The trial court granted the motion as to several counts, but denied the motion as to the remaining counts. The State appeals the trial court's order granting the new trial, as well as the court's failure to order Israel to pay restitution to several of the victims. Israel cross-appeals, claiming the trial court should have granted a new trial on all counts. Israel also alleges that a number of trial errors require reversal. King appeals from alleged errors in both the 1997 and 1999 trials.

We affirm King's 1997 convictions and his 1999 conviction for conspiracy to commit robbery in the first degree. We also affirm Israel's convictions for money laundering and conspiracy to commit robbery in the first degree. But we reverse both defendants' 1999 convictions for the substantive crimes of first degree robbery and kidnapping. Both defendants were prejudiced by the court's erroneous jury instructions, which allowed the jury to convict them for the foreseeable actions of their coconspirators, rather than requiring knowledge of the substantive crimes charged. Further, we remand for dismissal of Israel's first degree kidnapping conviction because we conclude that the evidence was insufficient to support his conviction as an accomplice on that charge. With regard to the State's appeal, we hold that the trial court should have ordered Israel to pay restitution to all the victims of the conspiracy.

## PROCEDURAL BACKGROUND

The State charged David Israel, William King, Vince Bryant, and Jeffrey Dorman with a total of 41 counts arising out of a series of eight home-invasion robberies from October 15, 1993, through March 3, 1994. The robberies occurred in King, Cowlitz, Snohomish, and other counties. The State alleged that King, Bryant, and Dorman participated in the robberies, while Israel agreed to dispose of the proceeds through his pawnshop. Count 1 was the general conspiracy count, while the other counts represented the substantive crimes allegedly committed by Dorman, King, and Bryant, including first degree robbery, assault, indecent liberties, and kidnapping. King denied he was present or aware of the robberies. Israel admitted he bought some of the robbery proceeds at his pawnshop, but claimed he did not know the jewelry was stolen until Bryant told him and threatened to harm him if he did not continue to do business with Bryant.

Dorman pleaded guilty and agreed to testify, and Bryant provided police with information in exchange for his immunity. *See State v. Bryant*, 146 Wn.2d 90, 42 P.3d 1278 (2002). King and Israel moved for severance, each seeking to be tried individually. The court granted the motion in part and denied it in part. In 1997, King was tried separately for his role in the robbery of Mira Hwang, resulting in his conviction for first degree robbery, second degree assault, and indecent liberties, all committed with a deadly weapon. In 1999, Israel and King were tried together for the conspiracy, which included the Hwang robbery and seven other robberies committed between October 15, 1993, and March 3, 1994. In the 1999 trial, Israel was tried for one count of conspiracy to commit robbery in the first degree, two counts of robbery in the first degree with a deadly weapon, two counts of kidnapping in the first degree with a deadly weapon, and one count of money laundering. King was tried for the conspiracy charge and two counts each of first degree robbery and first degree kidnapping. The jury convicted them both as charged, and these appeals followed.

## FACTS

### King's 1997 Trial

On March 3, 1994, Mira Hwang was house-sitting for family friends in a house in the Lake City neighborhood of Seattle when two masked men ran into the kitchen and attacked her. Hwang described the attackers as one being "shorter" and the other "taller and thinner." She testified that the two men threw her facedown on the floor. The shorter man held her down while the other man emptied her purse onto the counter. Although the men wore ski masks, the masks did not cover their entire faces; Hwang could see portions of their skin and testified that they were both African-American.

Hwang testified that during the 30 minutes that she was being held down, the men interrogated her about how old she was, her address, and personal identification numbers for her bank accounts and credit cards. They also asked where valuables were kept in the house. Hwang testified that she believed there was a third person in the house because she could hear someone else going through the rest of the house, which was later found to be completely ransacked. The men threatened Hwang with rape, and the shorter man pulled down her pants, touched her genitals, and asked her why she had to have her period. The taller man grabbed a knife from the kitchen and held it to her throat, threatening to cut her throat if she did not give him more information.

After about 30 minutes, the men lifted Hwang to her feet, tied her with items they found in the house and put a pillowcase over her head. The men continued to ask her questions and threaten her with rape and mutilation until the room suddenly became quiet. Hwang's boyfriend was at the front door ringing the doorbell. When she realized the men had fled, she made it to the door to let him in, and they called the police.

Police responded and tracked the robbers with a police dog, but the dog lost the scent. The next day, Hwang found

a folded piece of paper, about two inches by two inches in size, on the floor of the kitchen where she had been held down. Initially she thought it might be from her emptied purse or the property of a friend, but when she read it and realized it was neither, she gave it to Seattle police.

A detective investigated the information on the folded piece of paper. It contained directions to a business called Starving Student Movers. The detective contacted the manager of the business in Seattle. The manager provided the detective with copies of two job applications filled out on March 3, 1994. The applications were filled out in the names of the defendant, Willie King, and another man, King's roommate.

The Starving Student Movers' manager testified by stipulation that King called her on March 3, 1994, looking for work. She gave King directions over the phone on how to drive to the Seattle office. The manager did not think she could identify King, but recalled him as a well-groomed African-American male with a round face and short hair. A latent print examiner for the Seattle Police Department testified that she examined the piece of paper for fingerprints. She identified four areas on the note with potentially legible fingerprints, but only one area was actually legible. She further testified that the one identifiable print belonged to King.

Brian Vance also testified for the State. Vance had known King for about eight years. Vance recalled a conversation with King in about mid-1994 involving a home-invasion robbery King said he had committed. According to Vance, King told him that he was worried because he had lost a piece of paper somewhere during the commission of a robbery, and he did not know where the paper had been lost. Vance also testified that in January or February 1995, after King had been arrested and bailed out of jail, King talked to Vance again about the lost piece of paper. He told Vance that he was worried because while he was in jail, the police had talked to him and told him they had the piece of paper as evidence against him. On cross-examination, Vance said

he was not exactly sure whether the paper King was talking about contained directions to a home-invasion robbery or to a job, but later speculated that it must have contained directions to a home-invasion robbery. During redirect examination by the State, Vance again said that the paper contained directions to a robbery, and he knew this because King had told him.

Israel and King's 1999 Joint Trial

Vance was killed between the 1997 trial and the 1999 joint trial of King and Israel. King's conviction for the Hwang robbery was admitted at the 1999 trial as proof of the conspiracy. The trial court also admitted a videotape of Vance's testimony from the 1997 trial. The State claimed that, including the Hwang robbery, King participated in four of the eight robberies alleged as part of the conspiracy.

1. Dorman and Bryant Prior Statements to Investigators

While police were investigating the robberies, both Dorman and Bryant offered to disclose the identity of their "fence" in exchange for leniency. According to one detective's testimony, Dorman made reference to a person who he would not name, but referred to as "dude." Dorman said "dude" would order the robberies, and then he and the others would bring the merchandise back to "dude." When detectives pressed Dorman for a name, he said only that the person lived on Mercer Island and had not been in trouble with the law before. According to another detective, Bryant also sought out police when he learned he was under investigation and offered to tell them "who the fence was, who the guy was that had been sending him and his cohorts to these various places." Bryant referred to this person as "a rich, white guy on Mercer Island." Dorman eventually pleaded guilty to one count of conspiracy to commit robbery, and the State agreed to dismiss the other charges against him. Dorman had already pleaded guilty to two robberies committed in Bothell in February 1994. Bryant supplied prosecutors with information on the seven robberies after entering into a use immunity agreement, but did not participate in either trial at issue in this appeal. *See State*

*v. Bryant*, 97 Wn. App. 479, 481, 983 P.2d 1181 (1999), *cert. denied*, 531 U.S. 1016 (2000). Dorman testified for the State in the trial of Israel and King.

2. Dorman's Testimony

Dorman testified that he participated in seven of the eight home-invasion robberies with Bryant. Of those seven robberies, he testified that King was a driver or lookout in two. He also testified that King and Bryant robbed another home by themselves and told Dorman about it later. Dorman further testified that he and Bryant sold most the jewelry from the robberies to Israel, the owner of a pawnshop in Lynnwood.

The first robbery to which Dorman testified occurred in Longview on October 23, 1993. Dorman, Bryant, and King drove to a house that Bryant had selected previously. King stayed in the car while Dorman and Bryant robbed the family inside. After the Longview robbery, Dorman testified that he and Bryant went to a bar in Lynnwood, where Israel paid cash for the jewelry. Dorman did not talk to Israel or hear what he and Bryant said to each other at that meeting.

Dorman testified that on November 5, 1993, he, Bryant, and King robbed a house in Everett. King was the "lookout," while Dorman and Bryant tackled a man coming out of the house, took him back inside, and subdued the family. They ransacked the house and took a number of items, including jewelry.

Dorman testified that he first met Israel after the Everett robbery, when he and Bryant went to Israel's pawnshop and sold him the jewelry taken in that robbery. They went to Israel's Pawn-X-Change (hereafter PXC) store in Lynnwood. He and Bryant negotiated a price for the jewelry in Israel's office in the back of the shop. According to Dorman, Israel told him that the others working at the store "had nothing to do with it, and were not to have anything to do with it."

Dorman left for California shortly after the Everett robbery. While Dorman was gone, Jerry and Angelina

Burtenshaw were robbed in their Mercer Island home. Dorman returned in December. Dorman testified that shortly after he returned, he, Bryant, and King got together. Bryant told Dorman that he and King had robbed a house while Dorman was gone and that it was a "good score and . . . a lot of cash, jewelry. They'd gotten a good tip from Israel and it paid off." Dorman testified, over objection, that this information was "significant" to him because it meant "we were moving in that direction" of "[g]etting better scores, more information about robberies, or actually more profitable robberies." Dorman also testified that this information interested him because he and Bryant had been trying to get Israel to give them tips on more lucrative jobs.

Dorman testified that he and Bryant (without King) proceeded over the next month to commit four more robberies in Woodinville, Normandy Park, Shoreline, and Federal Way. Dorman's testimony did not indicate that Israel was responsible for directing them to any of these homes. Dorman did not testify regarding the Hwang robbery, which was the eighth and final robbery charged in the conspiracy.

3. Israel's Testimony

Israel testified in his own defense. He denied that he was a participant in the conspiracy and denied knowingly receiving stolen property. According to Israel's testimony, he first met Bryant through a business partner with whom Israel operated a jewelry store. Israel said he ran into Bryant in 1993 at a gun club, and Bryant asked if Israel was still in the jewelry business. Israel told Bryant about his new shop, the PXC in Lynnwood. Israel said he thought of Bryant as a "pocket vendor," a term he used for people who made their living "on the margins" by selling jewelry or other items out of their cars.

On October 23, 1993, Bryant came to the pawnshop and sold Israel some broken chains and diamonds. Israel paid Bryant $4,000. Israel said his business partner, Brad Shain, was present and participated in negotiating a price for the jewelry with Bryant. According to Israel, Bryant did not tell them any of the items were stolen. Israel said

Bryant came back in November with more diamonds and "scrap" jewelry. According to Israel, "scrap" jewelry was broken or loose jewelry that the PXC would sell wholesalers to be melted down or used in new jewelry. Israel testified that Shain was also present and negotiated with Israel at this second transaction and again claimed that neither of them knew the items were stolen. Shain testified and claimed he never engaged in those negotiations and that although he remembered Bryant, he never dealt with him directly.

On November 30, the Israels attended a memorial service for Israel's father. After the service, they went to his parents' home. Israel's mother told Israel and the others there that Mrs. Burtenshaw had called to express her condolences. Someone asked who the Burtenshaws were, and Israel's mother explained that they were family friends. She then went on to say that they were very wealthy, had built a new home on the water, and that Mrs. Burtenshaw dressed well, drove nice cars, and wore a diamond the size of her knuckle. Israel's wife testified that she heard this conversation.

The next day, on December 1, 1993, Israel testified that he went to work at the PXC. He found a message to call Bryant, who had been in the store in late November trying to sell Israel some sports cards. Israel called Bryant and told him he was interested in buying the cards. Israel testified that at some point, he struck up a conversation with Shain about the Burtenshaws and told Shain everything his mother had said the day before, including the part about the knuckle-sized diamond. By the time Israel finished the conversation, he said Bryant was standing there with the box of sports cards. Israel bought the sports cards and Bryant left. Brad Shain testified that he did not remember any of these events.

The next day, December 2, 1993, was the date the Burtenshaws were robbed in their home on Mercer Island. The day after that, Israel testified that Bryant showed up at the PXC with a small black bag full of "mangled jewelry."

Israel testified that the jewelry looked suspicious to him because, unlike the previous jewelry he had bought from Bryant, the jewelry was thrown into the bag in an unorganized fashion. Israel asked where the jewelry came from. Bryant said it did not matter, and wanted $100,000 for it. Israel refused to buy it. Bryant became agitated and demanded that Israel buy it. Israel left his office and got Brad Shain, and they both told Bryant to leave the store.

According to Israel, Bryant then became angrier and began to threaten them. Bryant told Israel that it was his fault "these people got robbed." He said, "[Y]ou're gonna buy this . . . or I'm gonna tag you with it." He threatened to kill them unless they did what he wanted. He asked if they were going to call the police, and they said no. After repeatedly being told to leave the store, Bryant left, saying he would be back. Shain denied that he was present during this exchange, although he testified that he had seen Bryant in the store several times and had heard Israel and Bryant arguing loudly on one occasion.

Israel testified that he went home and told his wife what had happened. She suggested that he call the police, but Israel said he was afraid Bryant would kill them if he did. Israel said his wife's brother had once mentioned a good criminal defense attorney, David Chesnoff, who lived in Las Vegas. The next day, Israel got Chesnoff's number and called to ask for advice. Chesnoff told Israel not to go to the police, not to take any jewelry from Bryant, and not to give him any money. Israel told his wife the advice, and she told him again that he should go to the police and suggested that perhaps he should buy the jewelry back and bring it to the Burtenshaws and go to the police with them. Israel called Chesnoff again and told him this idea. Chesnoff said Israel's wife was a "lunatic." Chesnoff and Israel's wife testified and corroborated these conversations.

Israel testified that Bryant visited the pawnshop again on the same day Israel spoke to Chesnoff. He offered to leave them alone in exchange for some money. Israel testified that he and Shain refused, and Bryant left. Israel

called Chesnoff again and told him what happened. Chesnoff said he did the right thing. Shain testified that Israel came to him and told him he was being extorted, but Shain denied that he was ever threatened or that he was present when Bryant extorted money from Israel.

Israel testified that Bryant kept coming back to the store and threatening him and Shain and their families. Eventually, Israel and Shain decided to pay Bryant in exchange for Bryant's promise to leave them alone. According to Israel, he and Shain cashed a series of checks and paid Bryant $8,000 on December 6, and another $4,000 on December 24. In addition, Israel said Shain paid Bryant another $2,000 in cash in May 1994. Shain denied that he ever gave Bryant money.

Israel said that in October 1994, he saw Bryant for the last time. Bryant demanded more money. Israel told Bryant he had "had it" and would not give Bryant any more money. Bryant's demeanor changed. He apologized and told Israel he never would have hurt him. Bryant said his wife was pregnant and again asked for money. Israel refused, and Bryant left.

Israel also testified that he had met Dorman, but knew him as "Corey Baker." He met Dorman in November 1993 when he came into the pawnshop and introduced himself as a jewelry vendor and a friend of Bryant's. Israel testified that he and Dorman discussed prices in general and then he sold Dorman four rings. Thereafter, Israel said he bought jewelry from Dorman on two occasions—in late December 1993 and in late January 1994. In particular, he testified that he bought an item that was described in the computer database as a "lavender jade diamond ring." The State introduced evidence that a similar ring was stolen during a Normandy Park robbery on December 28, 1993. Israel said he had no idea that Dorman was selling stolen items or that he was involved in robberies.

### 4. Burtenshaw Testimony

Jerry and Angelina Burtenshaw testified that they had been neighbors of the Israel family on Mercer Island. The

Burtenshaw children and David Israel were close in age and played together as children. The Burtenshaws attended Israel's wedding.

The Burtenshaws' home at the time of the robbery was on a winding, narrow road. There was a directional sign at a fork in the road nearby, but the Burtenshaws were not listed on the sign. They described their house as difficult to find. The jury was shown a videotape of the area where the Burtenshaws lived.

On December 2, 1993, Jerry Burtenshaw had just come home from shopping when he was attacked in his driveway. Two men forced Burtenshaw into his house, where he and his wife Angelina were held at gunpoint. One of the men asked, "Where is the safe?" Mrs. Burtenshaw led one of the men to the safe while the other watched Mr. Burtenshaw. After the robbery, the men tied both their hands and locked them in the trunk of their car.

5. Telephone Records

Telephone records showed a number of calls between the PXC and Dorman, Bryant, and King. The evidence also showed that a number of those calls coincided with the dates of the robberies. The day before the Burtenshaw robbery, someone at the PXC paged Vincent Bryant. The State's theory at trial was that Israel called Bryant to give him directions to the Burtenshaw house. One call was made from King's home to the Burtenshaw home at 2:45 P.M. on the day of the robbery, shortly before the robbery occurred. The day after the Burtenshaw robbery, a call was made from the PXC to Bryant's mother's house.

6. PXC Transactions

The State introduced testimony from a police computer forensics expert who analyzed the point-of-sale computer records of the PXC. He explained the laws governing pawnshops, including the requirements that pawnbrokers examine two pieces of government-issued identification and record the names of people selling items. The forensics expert testified that there was a high correlation between

the descriptions of items stolen from the Normandy Park robbery that occurred on December 28, 1993, and those recorded as being bought by PXC on January 5, 1994. The expert testified that it would be easy to hide stolen property by entering an item into the computer database as an inventory item rather than as pawn or a purchase, or by deleting or transferring the item in the database, or by not recording the name of the person or vendor from whom the item was purchased or to whom the item was sold.

The State introduced PXC transaction records that showed large cash transactions without indicating the name of the vendor. In addition, the dates of relatively large cash transactions from the PXC coincided with the dates of the robberies. A PXC store manager testified that it was company policy to enter every item into the computer and that Israel valued the jewelry that came into the store for pricing purposes.

Additional facts will be discussed as they pertain to the issues discussed herein.

## I. ISSUES PERTAINING TO KING'S 1997 TRIAL

### Accomplice Liability Instruction

King argues that his 1997 conviction must be reversed because the trial court erroneously instructed the jury concerning accomplice liability. In *State v. Cronin*, 142 Wn.2d 568, 580, 14 P.3d 752 (2000) and *State v. Roberts*, 142 Wn.2d 471, 511, 14 P.3d 713 (2000), the Supreme Court held that a defendant may not be convicted on the basis of accomplice liability unless the defendant had specific knowledge of the crime charged. In so holding, the court invalidated the accomplice liability instruction, 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 (2d ed. 1994) (WPIC). In King's trial, the State concedes that the trial court erroneously instructed the jury using WPIC 10.51.

The State contends, however, that the erroneous instruction was harmless.[2]

King argues that WPIC 10.51 lowered the State's burden of proof by omitting the element of specific knowledge of the charged crime. King further urges us to hold that such an error can never be harmless under the Washington Constitution. *Cf. Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (holding under United States Constitution that instruction omitting element of crime susceptible to harmless error analysis).

■ But we disagree that WPIC 10.51 lowers the State's burden of proof or omits an element of the charged offense in every case. To convict a defendant under Washington's accomplice liability statute, the State must prove that the defendant acted with knowledge that his or her actions would promote or facilitate the commission of the crime charged. RCW 9A.08.020(3)(a). WPIC 10.51 is flawed because it allows a jury to convict a defendant who knows that his or her actions will promote or facilitate "a crime." *Cronin*, 142 Wn.2d at 580; *Roberts*, 142 Wn.2d at 511. But WPIC 10.51 does not *omit* the knowledge element. Rather,

---

[2] The State also argues that King waived this assignment of error by failing to take exception to the accomplice liability instruction at trial. We do not generally review alleged trial court errors raised for the first time on appeal. But a defendant may raise, for the first time on appeal, a "manifest error affecting a constitutional right." RAP 2.5(a)(3). An error is "manifest" if the defendant demonstrates that it had practical and identifiable consequences in the trial. *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992). Where an instructional error may be construed as relieving the State of the burden of proving an element of its case, the error is manifest and of constitutional magnitude and may therefore be raised for the first time on appeal. *State v. Stein*, 144 Wn.2d 236, 241, 27 P.3d 184 (2001) (holding erroneous *Pinkerton* instruction manifest error) (*Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)); *State v. Eastmond*, 129 Wn.2d 497, 502, 919 P.2d 577 (1996) (holding omission of specific intent element manifest error). In most cases since *Cronin* and *Roberts*, where a defendant has challenged WPIC 10.51, we have exercised our discretion to review the claim of error even if the defendant did not object at trial and even where we eventually concluded that the error was harmless. *State v. Mangan*, 109 Wn. App. 73, 76 n.1, 34 P.3d 254 (2001) (choosing to review instruction without considering whether issue properly preserved below). Although in this case our inquiry into whether the defendant has shown a "manifest error" overlaps considerably with the issue of whether the error was harmless, we base our decision on harmless error analysis without deciding whether we would be justified in reaching the same result under RAP 2.5(a)(3).

it contains language that, under certain facts, could cause a jury to convict a defendant based on knowledge of a different crime. *See Cronin*, 142 Wn.2d at 580 (reversing because jury could have convicted defendant of murder based on conclusion defendant knew he was facilitating robbery). Thus, the inquiry into whether WPIC 10.51 omits an element or lowers the State's burden is inextricably interwoven with the question of whether it was harmless under the facts of a particular case. *See State v. Stein*, 144 Wn.2d 236, 241, 27 P.3d 184 (2001) (basing decision to review instructional error on fact that instruction could have been construed as failing to instruct on an element); *Cronin*, 142 Wn.2d at 580 (examining facts of particular case against each defendant before concluding that the instruction lowered State's burden of proof). Thus, without adopting or rejecting *Neder*, we hold that the facts of each case must be examined before determining whether the use of WPIC 10.51 was reversible error.

In this case, we are convinced that the instruction could not have had the effect of lowering the State's burden under the facts presented. All of the crimes for which King was charged were committed by two masked assailants together. The only disputed issue before the jury was that of identity.[3] The State's theory was that King was the shorter of the two masked men who attacked and robbed Mira Hwang. The defense theory was that the State had not shown King was present at the scene. There was no dispute that each of the assailants knew what the other was doing during the attack, and in fact, all the evidence indicated that they were working in concert throughout. Thus, when the jury found that King was one of those two men, the jury necessarily found that King acted with knowledge that his

---

[3] This fact is further illustrated by defense counsel's statements during closing argument:

"It's our position that the State has been able to prove that a crime was committed, robbery in the second degree. There is no doubt about it. You have ample evidence that a crime was committed. . . .

"It is our contention, though, the State has not proved that Willie King has committed a crime."

actions would promote or facilitate *the crimes* of robbery, indecent liberties, and assault against Hwang. In contrast to the facts presented in *Cronin* and *Roberts,* in this case there were no other crimes with which the jury could have been confused. *See State v. Mangan,* 109 Wn. App. 73, 79, 34 P.3d 254 (2001) (holding similar instruction harmless because "there was nothing to suggest [the defendant's accomplice] (or anyone else) had committed some other crime of which Mangan was possibly unaware"). We therefore hold that the use of WPIC 10.51 was harmless error under the facts of this case.

## Vance Testimony

King argues that the trial court abused its discretion by admitting the testimony of Brian Vance, in which Vance indicated that King had expressed concern about a piece of paper he left at a robbery. King's argument is not persuasive. Vance's testimony was relevant and highly probative, and the trial court properly determined that its probative value outweighed its prejudicial effect.

King first argues that Vance's testimony was not relevant. He asserts that there was an insufficient nexus between Vance's testimony and the Hwang robbery because Vance did not know or could not remember specifics about the robbery to which King was referring when he made the statement. Vance also mischaracterized the contents of the note as containing directions to a home-invasion robbery while the note found at the robbery contained directions to a moving company. But to be relevant, evidence need only make the existence or nonexistence of a material fact more or less likely. ER 401. Other evidence established that a note containing King's fingerprint was found at the scene of the Hwang robbery, and the note described directions to a moving company visited by King on the day of the robbery.[4] In such circumstances, evidence that King later admitted

---

[4] King also assigns error to the trial court's admission of the note. King does not, however, articulate any reasoned challenge to the admissibility of the note, although he does argue the probative value of the note in his challenge to the

dropping a note at a robbery raised a powerful inference that the note he was referring to was the same note found at the Hwang robbery. That likely and permissible inference, if drawn, made it much more likely that the note found at the Hwang robbery was not left there by someone else, as King argued, but because King dropped it there. Although Vance's inconsistent testimony as to the note's contents may affect the weight to be given this evidence, it does not affect its admissibility as relevant evidence probative of a material fact.[5]

■ ■ Once a court has determined that evidence is relevant, the court must weigh any prejudice the evidence will have against its probative effect. ER 403. King asserts that Vance's testimony was highly prejudicial, but he has not identified any unfair prejudice that would outweigh the probative value of this evidence. The trial court excluded any evidence of other illegal acts Vance and King did together, so King's argument in this respect hinges on his assertion that Vance's testimony necessarily referred to a note King dropped at some robbery other than the one charged. The State, however, did not argue that King was referring to another robbery when he told Vance about the note. Rather, the State argued that the piece of paper King told Vance about was the same note dropped at the Hwang robbery. Thus, the prejudicial nature of the testimony was slight to nonexistent, while the probative value was high.

sufficiency of the evidence. The note was clearly relevant to show that King was present at the scene, and the text of the note was not hearsay because it was not offered for the truth of the matters asserted therein. *See* ER 401, 801(c). Thus, we find no merit in King's assignment of error challenging the note's admissibility.

[5] King also argues that Vance's testimony necessarily referred to some other robbery and therefore must be analyzed as an "other" act under ER 404(b). But the jury could reasonably infer that Vance was talking about the same note found at the Hwang house despite Vance's statement that the note contained directions to a robbery. The State was not attempting to prove that King left notes at his robberies as a "signature" or that King was a robber generally, but that King dropped the particular note left at the scene of the Hwang robbery. *Cf. State v. Russell*, 125 Wn.2d 24, 66-67, 882 P.2d 747 (1994). Vance's testimony, therefore, was relevant not because it showed prior bad acts of King, but because it made it more likely that the piece of paper King told Vance about was the same piece of paper that was found, with King's fingerprint on it, at Mira Hwang's house after the robbery. Thus, this evidence is not subject to analysis under ER 404(b).

The trial court, therefore, did not abuse its discretion in admitting Vance's testimony.

## Sufficiency of the Evidence

King also challenges the sufficiency of the evidence supporting his 1997 convictions for first degree robbery, first degree assault, and indecent liberties.[6] "The standard of review is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990) (citing *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). This court does not substitute its judgment for that of the jury on factual issues. *State v. Farmer*, 116 Wn.2d 414, 425, 805 P.2d 200 (1991).

We conclude that the evidence presented was sufficient to convict King.[7] Although the State's case relied largely on circumstantial evidence, purely circumstantial evidence may be sufficient if it permits the jury to infer beyond a reasonable doubt that the defendant committed the crimes charged. *State v. McFarland*, 73 Wn. App. 57, 70, 867 P.2d 660 (1994). The note with King's fingerprints found at the scene, together with the testimony of Brian Vance, allowed the jury to conclude that King was at the scene of the robbery and dropped the note. Further, Hwang's description of the two robbers who held her down and assaulted her permitted the jury to conclude that King was the shorter robber who subjected her to indecent

[6] King also argues that the trial court erroneously denied his motions to dismiss for failure to make out a prima facie case of guilt. *See State v. Knapstad*, 107 Wn.2d 346, 356-57, 729 P.2d 48 (1986). But "[r]egardless of when a court is asked to examine the sufficiency of the evidence, it will do so using the best factual basis then available." *State v. Jackson*, 82 Wn. App. 594, 608, 918 P.2d 945 (1996) (citing *State v. Allan*, 88 Wn.2d 394, 396, 562 P.2d 632 (1977)). Thus, when reviewing a trial court's denial of a *Knapstad* motion, an appellate court conducts the same inquiry as when we review the sufficiency of the evidence.

[7] As we have concluded above, the testimony of Brian Vance and the note found at the robbery were properly admitted at trial. Thus, we reject King's argument that we must discount those pieces of evidence in our sufficiency analysis.

liberties. The note was found in the area where Hwang was being held down, further indicating that it was dropped by one of the two men. Although this evidence may not have compelled the jury's finding of guilt, permissible inferences from the evidence could convince a rational juror beyond a reasonable doubt that King was guilty of the crimes charged.

## Ineffective Assistance of Counsel

King also argues that he received ineffective assistance of counsel during his 1997 trial. A defendant has a Sixth Amendment right to effective assistance of counsel. When a defendant claims he has been deprived of that right, we begin with a "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 487, 965 P.2d 593 (1998) (citing *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To succeed in this claim, King must establish that (1) "counsel's conduct fell below an objective standard of reasonableness" and (2) "but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different." *Pirtle*, 136 Wn.2d at 487. A valid tactical decision cannot provide the basis for an ineffective assistance claim. *State v. Alvarado*, 89 Wn. App. 543, 553, 949 P.2d 831 (1998). King alleges that his trial counsel was deficient for failing to (1) introduce exculpatory evidence, (2) make certain arguments to the jury, and (3) object to various statements made by the State in closing arguments.

### 1. Exculpatory Evidence

King first argues that his attorney should have introduced exculpatory evidence. King alleges that the State took a handwriting exemplar but was unable to conduct an analysis or match King's handwriting to the handwriting on the note. But King has not carried his burden of showing what evidence, if any, his attorney could have presented to

the jury. A few days before trial, the prosecution obtained an order requiring the defendant to produce a handwriting exemplar. But the record does not show why there was never any handwriting analysis presented to the jury by the prosecution or the defense. The record establishes only that the State obtained a handwriting exemplar from King. King points to no part of the record that indicates whether an analysis was performed. Even assuming, as King asserts, that no analysis was performed, there is no indication why it was not performed. King either assumes that the note and exemplar were insufficient for the expert to conduct an analysis or makes that assertion based on information not contained in the record. Thus, to the extent that he argues that his attorney should have introduced some exculpatory evidence, he has not shown what that evidence would be.

## 2. Failure to Make Arguments

King also claims his attorney was deficient for failing to argue the State's failure to introduce a handwriting analysis. King further claims his attorneys should have pointed out to the jury that the other unidentifiable, smudged fingerprints on the note could have belonged to someone other than King. But King's attorneys' reasons for failing to make these arguments is not in the record, and the determination of which arguments to advance in closing is a tactical decision susceptible to a wide range of acceptable strategies. *See, e.g., State v. Soonalole*, 99 Wn. App. 207, 216, 992 P.2d 541, *review denied*, 141 Wn.2d 1028, 11 P.3d 827 (2000). King's attorneys might have seen these as weak arguments, or they might not have wanted to invite explanations from the State on rebuttal. Absent some indication that the failure to make these arguments was due to oversight rather than strategy, we cannot say that the failure to make these arguments is so far outside the standard of professional judgment that King was denied his Sixth Amendment right to counsel.

## 3. Failure to Make Objections

Finally, King's attorneys cannot be faulted for their failure to object during the State's rebuttal argument,

because King has not shown that any of the prosecutorial statements he complains of were improper or prejudicial. A prosecutor has wide latitude in closing argument to draw permissible inferences from the evidence and to express such inferences to the jury. *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). King argues that the prosecutor mischaracterized the evidence by saying that there was no evidence that anyone but King possessed the note prior to the robbery. That statement, however, was true. King was not ruled out as the source of the smudged fingerprints; those prints simply could not be identified as belonging to anyone, including King. Thus, because the only legible fingerprint belonged to King, he was the only person proven to have handled the note. Second, King argues that the prosecutor should not have been allowed to refer to the shorter robber as "stocky," because Mira Hwang did not use that word when describing him. But Mira Hwang said the taller robber was "thinner," so, by definition, the shorter robber was "stockier." King also argues that the prosecutor impermissibly commented that Brian Vance was fearful and hesitant while testifying. But Vance's credibility had been attacked, and it was permissible for the prosecutor to point out Vance's hesitant demeanor in arguing Vance's credibility to the jury.

■ Finally, the prosecutor's statement that Vance would not be shocked by an admission that King had committed a crime was not improper in context. Vance's criminal history was before the jury, while King's was not. Further, King's attorney expressed incredulity during cross-examination of Vance that King would bring up his involvement in a crime during casual conversation. The fact that Vance had engaged in crimes before made it more likely that King would bring up his own crimes in casual conversation with Vance. In context, then, this comment was obviously meant to rebut the statements of opposing counsel, not to comment on King's criminal character. Further, we will not presume that the latter impermissible inference was meant or taken, especially in the absence of

any objection by the defense. *See State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990) (noting lack of objection strongly suggests comment did not seem critically prejudicial in context of trial). Because we find no impropriety in the State's arguments, we conclude that King's attorneys did not render deficient representation by failing to object to them.

### 4. Prejudice

Further, even assuming counsel's performance was deficient in some of the above aspects, King has made no showing that the outcome of the trial would have been different if his attorneys had made all the arguments and objections King now says they should have made. None of the above arguments is so persuasive that it can be said it likely would have changed the outcome of the trial. King's two attorneys presented a vigorous defense, but the properly admitted evidence against him was substantial. King has not shown he was denied a fair trial by ineffective assistance of counsel.

## Cumulative Error

Finally, King argues that he is entitled to a new trial due to cumulative error. An accumulation of nonreversible errors may combine to deny a defendant a fair trial. *State v. Perrett*, 86 Wn. App. 312, 322, 936 P.2d 426, *review denied*, 133 Wn.2d 1019, 948 P.2d 387 (1997). King argues that his attorneys' ineffective representation and the court's erroneous admission of evidence combined to deprive him of due process. But with the exception of the erroneous accomplice liability instruction, King has not shown that any of the court's rulings were erroneous or that his attorneys' representation was constitutionally deficient. Thus, the cumulative error doctrine does not require that King be granted a new trial.

### Conclusion as to 1997 Trial

King has not shown that the trial court committed reversible error in his 1997 trial. The accomplice liability instruction does not require reversal because it could not have had the effect of omitting an element of the charged offense or lowering the State's burden under the facts of this case. The trial court properly admitted the testimony of Brian Vance which, along with other evidence properly admitted, was sufficient to convince a reasonable juror of King's guilt beyond a reasonable doubt. Further, King has not shown that his attorneys' representation fell below the standard guaranteed by the Sixth Amendment. Accordingly, we affirm King's 1997 convictions for first degree robbery, first degree assault, and indecent liberties.

### II. ISSUES PERTAINING TO THE 1999 TRIAL OF ISRAEL AND KING

#### 1. Issues Raised by Both Israel and King

##### *Pinkerton* Instruction

In the 1999 joint trial of Israel and King, the trial court gave the following jury instruction:

> Each member of a conspiracy is responsible for the actions of other members performed during the course of and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed the crime. Therefore, you may find the defendant guilty of robbery in the first degree as charged if the State has proved each of the following elements beyond a reasonable doubt:
>
> First, a person alleged to be a coconspirator committed robbery in the first degree;
>
> Second, the person was a member of the charged conspiracy;
>
> Third, the person committed robbery in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the charged robbery was committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Court's instruction 35. The above instruction derives from *Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), which held that a defendant is responsible for reasonably foreseeable acts committed by coconspirators in furtherance of the conspiracy.

In *State v. Stein*, 144 Wn.2d 236, 244, 27 P.3d 184 (2001), the Supreme Court held that the *Pinkerton* doctrine inaccurately reflects the scope of coconspirator liability in Washington. The court noted that Washington's criminal conspiracy statute, RCW 9A.28.040, provides liability for criminal conspiracy only; it is silent on vicarious liability for the acts of coconspirators. *Stein*, 144 Wn.2d at 244. Thus, the court held that vicarious liability of coconspirators, if any, must be based on Washington's accomplice liability statute. *Stein*, 144 Wn.2d at 244-45. In Washington, accomplice liability requires knowledge of "the crime" charged, not merely "a crime." *Stein*, 144 Wn.2d at 245 (citing *State v. Roberts*, 142 Wn.2d 471, 510-11, 14 P.3d 713 (2000) and *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000)). Accordingly, the court held that the *Pinkerton* "foreseeability" doctrine could not be the basis for vicarious liability under Washington law. *Stein*, 144 Wn.2d at 246.

The State argues that this court should nevertheless hold that the *Pinkerton* instruction was appropriate under the facts of this case. Under federal law, a defendant must be found guilty of participation in the underlying conspiracy charge in order to be vicariously liable for crimes of coconspirators under *Pinkerton*. *See Stein*, 144 Wn.2d at 244. The State argues that this case is distinguishable from *Stein* because in that case the defendant was not convicted of the underlying conspiracy charge. The Court of Appeals reversed on that narrow basis in *Stein*, holding that even if *Pinkerton* applied, the court's instructions violated federal

conspiracy jurisprudence by allowing the jury to convict Stein of the substantive crimes of his coconspirators without convicting him of the underlying conspiracy as well. *See State v. Stein*, 94 Wn. App. 616, 625, 972 P.2d 505 (1999), *aff'd on other grounds*, 144 Wn.2d 236, 243-44, 27 P.3d 184 (2001). But on review of that decision, the Supreme Court clearly went beyond the Court of Appeals' holding and reached the issue of whether the *Pinkerton* doctrine is viable in Washington. *See Stein*, 144 Wn.2d at 243-44. Thus, the State's request is actually an invitation for this court to reexamine the reasoning in *Stein*. But this court is bound by *Stein*'s unambiguous holding that *Pinkerton* is not the law in this state. Adhering to *Stein*, we hold that the trial court erred in instructing the jury on *Pinkerton* liability.

### Harmless Error Analysis: Israel

██ ██ The State argues that even if the *Pinkerton* instruction was given in error, it was harmless error in Israel's case. We disagree. First, we will not assume that the jury convicted on the basis of accomplice liability rather than coconspirator liability merely because the State's closing argument focused on accomplice liability. As the Supreme Court stated in *Stein*, "When a defendant is convicted under alternative theories, one acceptable and the other based on an erroneous instruction, this court has not been willing to substitute its judgment for that of the jury by inferring that the verdict was reached under the correct instruction." *Stein*, 144 Wn.2d at 247. Although the jury could have convicted based on accomplice liability, we simply do not know whether they found Israel had knowledge of the crime, or they decided that knowledge was immaterial given the *Pinkerton* instruction.

The State argues that by finding Israel guilty of conspiracy to commit first degree robbery, the jury necessarily found that Israel had knowledge of "the crime" of first degree robbery against the Burtenshaws. This argument

would be persuasive if the Burtenshaw robbery were the only robbery charged in the conspiracy. But here, there were seven other robberies charged, and the jury could have found Israel guilty of the conspiracy charge based on his participation in any or all of them. In *Stein*, the court reversed because "the jury here could have found Stein guilty of attempted murder under the *Pinkerton* conspiracy instructions based on the finding that he and Norberg agreed to assault Hall, even if he had no idea that his coconspirators would attempt to commit murder." *Stein*, 144 Wn.2d at 247. Likewise, the jury in this case could have found Israel guilty of the first degree robbery of the Burtenshaws based on the finding that he agreed to participate in the conspiracy, even if he had no idea that his coconspirators would rob the Burtenshaws. Although there was substantial evidence implicating Israel in the planning of the Burtenshaw robbery, there was conflicting evidence on that issue, and we will not substitute our judgment for that of the jury or weigh the evidence on appeal. Thus, we cannot say that the trial court's erroneous instruction was harmless in Israel's case.

## Harmless Error Analysis: King

The State further argues that even if this court finds the *Pinkerton* instruction was reversible error as applied to Israel, this court should find the error harmless as applied to King. The evidence indicated that King, unlike Israel, was present and participated in four of the eight robberies. Thus, the State argues that the jury necessarily found King guilty as a principal rather than an accomplice and that he obviously knew and intended the brutal nature of the robberies.

But this court could not find harmless error as to King without weighing the evidence or assuming what evidence the jury did and did not find persuasive. The jury could have been convinced that King participated in other robberies in the charged conspiracy, while remaining

unconvinced that King participated in the Burtenshaw robbery for which he was charged. The court's *Pinkerton* instruction would nevertheless allow the jury to conclude that King, as a member of the conspiracy, was liable for all his cohorts' actions regardless of whether he knew of them, as long as he could reasonably foresee that they would commit the crimes. And although the jury certainly had substantial evidence from which it could have convicted King as a principal or accomplice rather than as a coconspirator, we will not assume that the jury convicted King based on the correct accomplice liability instruction or on the basis of principal liability, where it is also possible that they convicted on the basis of *Pinkerton* liability. *Stein*, 144 Wn.2d at 247. Accordingly, we conclude that the erroneous *Pinkerton* instruction was not harmless with regard to King.[8]

### Effect of *Pinkerton* Instruction on the Kidnapping Convictions

Although the trial court instructed the jury that it could convict Israel and King of robbery on the basis of foreseeable acts of their coconspirators, the court did not give a similar instruction with regard to the kidnapping charge. The State argues, therefore, that the jury necessarily convicted Israel and King of kidnapping on the basis of principal or accomplice liability, rather than *Pinkerton* liability. Accordingly, the State urges us to affirm the defendants' kidnapping convictions.

But the instructions, taken as a whole and given the particular circumstances of this case, could lead reasonable jurors to believe that they could convict the defendants of kidnapping without finding they had knowledge of that

---

[8] Because we conclude that the instruction was not harmless with regard to either defendant, we need not address the defendants' argument that the instruction omits an element of the charged offense and thus can never be harmless error. And since we have concluded that the instructions given were an inaccurate statement of the law, we need not address the defendants' argument that their attorneys were ineffective for failing to object to the prosecutor's alleged misstatements of the law concerning the scope of *Pinkerton* liability.

specific crime. Instruction 35, the *Pinkerton* instruction, states generally that "[i]f one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed the crime." Although the instruction goes on to apply this principle specifically to the first degree robbery charge, nothing in the instruction prohibits the jury from applying the same principle to the kidnapping charge.

Further, the last sentence of instruction 30 states, "Once you have decided that the defendant was a member of a conspiracy, the defendant is responsible for what other conspirators said or did to carry out the conspiracy, whether or not the defendant knew what they said or did." The State correctly points out that instruction 30 was meant to instruct the jury on liability for the underlying conspiracy, not vicarious liability for substantive crimes. But this was not made clear to the jury, and with the *Pinkerton* instruction, the jury would not necessarily be aware of this distinction. Thus, there is a very real possibility that the above sentence from instruction 30, together with the language in instruction 35, led the jury to believe that they need not deliberate on whether the defendant had knowledge of the specific crime charged—a reading that is contrary to the accomplice liability statute as interpreted by *Stein*, *Cronin*, and *Roberts*. Accordingly, as in the case of the robbery charges, we must reverse rather than speculate as to which theory the jury used to convict Israel and King of the kidnapping charges.[9]

Because the jury, as instructed, could have applied *Pinkerton* liability principles to both the robbery and kidnapping charges, we hold that the defendants' kidnapping convictions must be reversed. *Pinkerton*, 328 U.S. 640. In addition, we urge trial courts in the future to carefully distinguish in jury instructions between liability for the underlying conspiracy and liability for any substantive

---

[9] In this case, this concern is further illustrated by the fact that the jury convicted Israel of kidnapping, even though, as we conclude below, there was insufficient evidence to support a finding that Israel had knowledge of that crime.

crimes that may be charged on an accomplice theory. After *Stein*, language that might have formerly been seen as appropriate may now be misleading, and should be reexamined to avoid juror confusion.

## Coconspirator Statements

During the 1999 trial, Dorman testified, over objection, to statements Bryant made to him that incriminated Israel and King. The trial court concluded that the statements were admissible as statements of a coconspirator in furtherance of the conspiracy. Israel and King both argue that the statements were hearsay because they were not made in furtherance of the conspiracy. They further argue that the admission of the statements violated the confrontation clause of the Sixth Amendment.

Although hearsay is generally inadmissible, ER 801(d)(2)-(v) excludes from the definition of hearsay any "statement by a coconspirator of a party during the course and in furtherance of the conspiracy." At issue is whether Bryant's statements to Dorman were "in furtherance" of the conspiracy and therefore admissible under the rule.[10]

██ ██ Courts generally interpret the "in furtherance" requirement broadly. *State v. Baruso*, 72 Wn. App. 603, 615, 865 P.2d 512 (1993). A statement meant to induce further participation in the conspiracy or to inform a coconspirator about the status of the conspiracy is sufficient. *See United States v. Herrero*, 893 F.2d 1512, 1527 (7th Cir. 1990) (listing examples of furtherance including, inter alia, "statements made to keep coconspirators advised as to the progress of the conspiracy"); *United States v. Miller*, 664 F.2d 94, 98 (5th Cir. 1981) ("'Puffing, boasts, and other conversation . . . are admissible when used by the declarant to obtain the confidence of one involved in the conspiracy.'"). *See also* 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 801.61, at 386-87 (4th ed. 1999) (citing above cases).

---

[10] Israel and King do not dispute that the other requirements of ER 801(d)(2)(v) were met.

■■■ On the other hand, casual, retrospective statements about past events do not fall within the coconspirator exception because they do not further the conspiracy. *Baruso*, 72 Wn. App. at 614-15 (citing *State v. Anderson*, 41 Wn. App. 85, 105, 702 P.2d 481 (1985), *rev'd in part on other grounds*, 107 Wn.2d 745, 733 P.2d 517 (1987)). But statements relating past events are admissible under the rule as long as they facilitate the criminal activity of the conspiracy. *Baruso*, 72 Wn. App. at 615 (holding statements furthered conspiracy because witness testified they were "veiled threats" to encourage witness to cooperate with the conspiracy); *Anderson*, 41 Wn. App. at 92 n.2, 105 (statements regarding past shootings held to be in furtherance of conspiracy because directed at frightening witness; but statements to other witness regarding same shootings not in furtherance of conspiracy because they "were nothing more than casual, retrospective comments made in conversation about past events").

In this case, Dorman testified that he was in California from mid-November to the end of December 1993. When he returned, he met with Bryant and King. Bryant told him he and King had committed a robbery on Mercer Island and "scored" a lot of cash and jewelry.[11] He showed Dorman a roll of money, gave him a few hundred dollars from it, and said the money was from the robbery. Bryant said he had gotten the tip for the robbery from Israel. Dorman further testified that the fact Israel had given them a tip was important because he and Bryant previously had been trying to find more profitable robberies by asking Israel

---

[11] As the State argues, this statement was also an adoptive admission by King and therefore independently admissible against him under ER 801(d)(2)(ii). Dorman's testimony indicated that Bryant told him about the robbery while the three of them were in Bryant's car. Although Dorman did not indicate whether King said anything about the robbery, he earlier indicated that "they" told him about it, strongly indicating that King was involved to some extent in the conversation. Even if King were silent, his acquiescence is enough in such circumstances to impute the statement to him as an admission. Silence constitutes adoptive admission if (1) the party-opponent heard an accusatory or incriminating statement and was mentally and physically able to respond and (2) the statement and circumstances were such that it is reasonable to conclude that the party-opponent would have responded had there been no intention to acquiesce. *State v. Neslund*, 50 Wn. App. 531, 551, 749 P.2d 725 (1988).

where to go. To Dorman, the information signified that "we were moving in that direction" of "[g]etting better scores, more information about robberies, or actually more profitable robberies." Dorman also testified that he went to California to get away from his criminal lifestyle, but after he returned from California, he participated in two more robberies. The trial court found that Bryant's statement "was made to induce further participation in the conspiracy, to advise Dorman of the health and viability of the conspiracy, and to reassure him of the continued existence of the conspiracy."

Under these facts, the trial court properly ruled that the statements were made in furtherance of the conspiracy. Israel argues that there was no evidence to show that Bryant's statements were intended to induce Dorman's continued participation in the conspiracy. Israel argues that the trial court erred by focusing on the significance of the statement to Dorman rather than Bryant's intent in making the statement. Because there was no direct evidence of Bryant's intent, Israel argues that the "in furtherance" requirement was not met. It is true that Bryant did not explicitly articulate that he was making the statement to induce Dorman's further participation in robberies. But such intent can be inferred from the circumstances of the above encounter. Bryant's statement, combined with his loan of several hundred dollars to Dorman, strongly suggests that he was assuring Dorman that he was still welcome in the conspiracy. Further, even if the evidence was insufficient to show Bryant was coaxing Dorman back into the conspiracy, it was certainly sufficient to support the trial court's conclusion that the statement was made to advise Dorman of the conspiracy's progress and to let Dorman know that the conspiracy was still operating. Any one of these three bases for the trial court's decision is sufficient to establish that the statement was in furtherance of the conspiracy. *See* 5B TEGLAND, *supra*, at 386-87. The trial court properly admitted Bryant's statements under ER 801(d)(2)(v).

██ Israel and King also argue that the admission of Bryant's statement violated the confrontation clause of the Sixth Amendment. But statements of coconspirators are "well-rooted exceptions" to the hearsay rule, and thus, unlike the cases cited by King involving statements against interest, no additional "indicia of reliability" are required to satisfy constitutional concerns. *Bourjaily v. United States*, 483 U.S. 171, 182-83, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *State v. Palomo*, 113 Wn.2d 789, 797-98, 783 P.2d 575 (1989) (citing coconspirator statements as firmly rooted); *State v. St. Pierre*, 111 Wn.2d 105, 118, 759 P.2d 383 (1988) ("Coconspirator statements are generally considered sufficiently reliable to withstand confrontation clause scrutiny even without corroboration."). *Cf. St. Pierre*, 111 Wn.2d at 117 (finding neither coconspirator exemption nor penal interest exception applicable). Therefore, the admissibility of Bryant's statements under the firmly rooted coconspirator exemption automatically establishes their admissibility under the confrontation clause, and no further inquiry is required. *See Bourjaily*, 483 U.S. at 182-83.

2. Issues Raised by Israel

### Sufficiency of the Evidence

██ Israel argues that this court should order dismissal of his conspiracy, robbery, and kidnapping charges due to insufficient evidence presented at trial.[12] In a sufficiency challenge, the test is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). This court draws all reasonable inferences from the evidence in favor of the State and assumes the truth of the State's evidence. *State v. Holbrook*, 66 Wn.2d 278, 279, 401 P.2d 971 (1965).

---

[12] Israel concedes that there was sufficient evidence to convict him of the money laundering charge.

### A. Conspiracy Charge

 To prove the conspiracy charge, the State had to prove that Israel agreed with one or more persons to cause conduct constituting robbery in the first degree, that he made the agreement with the intent that such conduct be performed, and that a person involved in the agreement took a substantial step in pursuance of the agreement. RCW 9A.28.040(1). A conspiracy may be proven by a " 'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.' " *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987) (quoting *Marino v. United States*, 91 F.2d 691, 694 (9th Cir. 1937)). A formal agreement is not necessary, *State v. Smith*, 65 Wn. App. 468, 471, 828 P.2d 654 (1992), and the conspiracy may be proved by circumstantial evidence. *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997); *State v. Brown*, 45 Wn. App. 571, 579, 726 P.2d 60 (1986). Further, once a conspiracy has been established, "evidence of a defendant's slight connection to it . . . is sufficient to convict him of participation in the conspiracy." *Barnes*, 85 Wn. App. at 664.

 Israel argues that the conspiracy charge must be dismissed because there was insufficient evidence that he agreed or intended that the crime of robbery in the first degree should occur.[13] But the evidence, viewed in the light most favorable to the State, clearly supported Israel's conviction as a member of the conspiracy. Dorman testified that he told Israel the jewelry he brought him came from robberies.[14] Further, Dorman testified that Israel asked for

---

[13] As charged against Israel, the elements of robbery in the first degree include: (1) the defendant or an accomplice took personal property from the person or in the presence of another with intent to commit theft; (2) the taking was against the person's will by the use or threatened use of force, violence, or fear of injury to that person or another; (3) the force or fear was used to obtain or retain possession of the property; and (4) the defendant or an accomplice was armed with a deadly weapon or displayed what appeared to be a deadly weapon. RCW 9A.56.200(1).

[14] Israel argues that Dorman's testimony was insufficient to establish Israel's knowledge of robberies. Dorman did not clearly articulate how much he told Israel about the robberies. At first, he simply stated, "He knows what we do." When prompted further, Dorman seemed to use the terms "robbery" and "burglary" interchangeably. Israel submits that this was insufficient to prove beyond a reasonable doubt that he knew the jewelry came from robberies. But at least one

"high-ticket" items, such as Rolex watches, many of which are likely to be found on another's person; in fact, Jerry Burtenshaw testified that his assailants took a Rolex watch from his wrist. Dorman testified that Israel assured him that they could bring him such items without "mangling" them and that "the police aren't going to find out about it." Dorman also testified that when he brought Israel the jewelry, Israel told him that the other people in the PXC "had nothing to do with it and were not to have anything to do with it." Further, Dorman testified that he and Bryant had been trying to get Israel to give them tips on better places to rob and that after he returned from California, Bryant told him that Israel finally had given them a "tip" on a very lucrative robbery. This evidence, viewed in the light most favorable to the State, was sufficient to prove Israel had an agreement with Bryant that he and his cohorts would commit robberies and bring Israel the proceeds and that Israel intended that such robberies take place. The agreement may not have been explicit or formal, but the evidence supports an understanding between the defendants, which is all that the law requires. *Smith*, 65 Wn. App. at 471.

In particular, the jury had substantial evidence from which it could conclude that Israel conspired with Bryant to commit the Burtenshaw robbery. The Burtenshaw and Israel families were friends and neighbors, and the Burtenshaws attended Israel's wedding. The Burtenshaw home is on a winding, hard-to-find road in an isolated location on Mercer Island. The reader board that listed residents of the area did not list the Burtenshaws, and the jury saw a videotape of the road leading to the house. They also heard evidence that Bryant and King lived in Everett—a city located approximately 30 miles from the Burtenshaw home in Mercer Island—whereas Israel grew up on Mercer Island and was familiar with the area. The

---

permissible inference from Dorman's testimony was that Israel knew he and Bryant were taking property by force. In light of all the evidence, the jury could reasonably conclude that Dorman told Israel enough to make him aware that he was committing robberies rather than thefts or burglaries.

day before the Burtenshaw robbery, someone at PXC paged Bryant. The State's theory was that Israel called Bryant to give him directions to the Burtenshaw house. The next day someone at King's house called the Burtenshaw residence. Also on the day after the robbery, Bryant brought the Burtenshaw jewelry to Israel to sell. Dorman testified that when he returned from California in late December 1993, Bryant told him about a robbery he and King had done in which they had gotten a "good score and . . . a lot of cash, jewelry. . . . They'd gotten a good tip from Israel and it paid off." Dorman testified that this information was of interest to him because they had been trying to get Israel to give them information on more lucrative jobs. Given this evidence, the jury could reasonably reject Israel's explanation of events—that Bryant overheard Israel talking about the Burtenshaws and found them on his own—and conclude instead that Israel provided directions to Bryant with the understanding that he would rob them.

Israel argues that even if the evidence was sufficient to show he conspired to commit robberies, there was no evidence that he intended or agreed that weapons would be used. Accordingly, he argues that the evidence was insufficient to convict him of conspiracy to commit robbery in the first degree. We disagree. The above evidence allowed the jury to conclude that Israel, rather than being a mere "fence" for stolen jewelry, was deeply involved in the planning of the Burtenshaw robbery. From this, the jury could infer Israel knew details of the plan including that Bryant would use weapons. Further, although Dorman did not explicitly state that he and Bryant discussed the use of weapons with Israel, he testified that he told Israel "what we do." Implied in this statement is that Israel knew the details of the robberies, including the use of weapons. At least, that is one inference that the jury was entitled to draw from the evidence presented.

Further, even if we assume that Israel did not know Bryant intended to rob the Burtenshaws with weapons, after the Burtenshaw robbery, Israel admittedly knew that

Bryant had committed that robbery with a weapon and in a violent manner. The State's evidence indicated that Dorman and Bryant robbed at least four more houses after the Burtenshaw robbery, and Israel admitted that he bought jewelry from Dorman on two occasions after the Burtenshaw robbery. Assuming the truth of the State's evidence,[15] the jury could reasonably see Israel's continued support of the violent robberies as a tacit agreement that Dorman and Bryant should continue committing robberies in the same manner. *See Smith*, 65 Wn. App. at 471 (formal agreement not necessary). Thus, even if Israel had not known enough before the Burtenshaw robbery to make him guilty of the conspiracy charge, the jury was entitled to infer that Israel both agreed and intended that future first degree robberies should occur once Israel knew the robbers' modus operandi and continued to encourage their activity. The State's evidence was sufficient to prove beyond a reasonable doubt that Israel was guilty of conspiracy to commit robbery in the first degree.

B. Substantive Charge of First Degree Robbery

The evidence was also sufficient to convict Israel as an accomplice[16] to the substantive crime of first degree robbery committed against the Burtenshaws. As noted above, when viewed in the light most favorable to the State, the evidence was sufficient to establish that Israel knew, prior to the Burtenshaw robbery, that the jewelry he bought from Dorman and Bryant came from robberies. The evidence was also sufficient to establish that Israel sent Bryant and his cohorts to the Burtenshaw residence for the purpose of

---

[15] Although Israel claimed he did not know that Dorman engaged in robberies with Bryant, the jury was entitled to reject that testimony and adopt Dorman's conflicting account. Dorman testified that he and Bryant went to Israel together a number of times after previous robberies and that Dorman told Israel the jewelry came from robberies. Dorman's testimony also indicated that Israel's reason for refusing the jewelry from the Burtenshaw robbery was not that it was stolen, but because it was from that particular robbery and was therefore too "hot."

[16] As noted above, if Israel is to be found guilty of the substantive crime of robbery, it must be as an accomplice or principal; there is no vicarious coconspirator liability in Washington other than accomplice liability. *State v. Stein*, 144 Wn.2d 236, 246, 27 P.3d 184 (2001).

robbing them, and that Israel knew the robbers would be armed.[17] We therefore conclude that the evidence was sufficient to convict Israel as an accomplice to the first degree robbery of the Burtenshaws. On remand, the State may prosecute Israel as an accomplice on that charge without the erroneous *Pinkerton* instruction discussed above.

### C. Kidnapping Charge

■ We are convinced, however, that dismissal is required with regard to Israel's conviction for first degree kidnapping. While an accomplice may be convicted of a higher degree of the general crime he sought to facilitate, he may not be convicted of a separate crime absent specific knowledge of that general crime. *In re Pers. Restraint of Sarausad,* 109 Wn. App. 824, 836, 39 P.3d 308 (2001). The State argues that kidnapping is a natural consequence of robbery and, therefore, no specific knowledge of the crime is required. But although the kidnapping of the Burtenshaws was certainly foreseeable, foreseeability is not sufficient to establish accomplice liability. *State v. Stein,* 144 Wn.2d 236, 246, 27 P.3d 184 (2001). Although the evidence was sufficient to show that Israel was involved in planning the Burtenshaw robbery, none of the evidence indicated that kidnapping was a part of that plan, and in fact, the testimony of the victims indicated that the decision to lock the Burtenshaws in their trunk was a spontaneous one made at the scene by Bryant and King. Absent any evidence that Israel knew Bryant planned to commit *the* crime of kidnapping, the evidence was insufficient to convict Israel of kidnapping. Israel's conviction for first degree kidnapping is dismissed with prejudice.

---

[17] Even if Israel had not known Bryant would be armed when he robbed the Burtenshaws, an accomplice need not have specific knowledge of every element of the crime committed by the principal, provided that the accomplice has general knowledge of that specific crime. *In re Pers. Restraint of Sarausad,* 109 Wn. App. 824, 835, 39 P.3d 308 (2001) (holding defendant charged as accomplice to first degree murder need know only that he is facilitating a homicide). Israel, therefore, could still be liable as an accomplice to first degree robbery as long as he had general knowledge that he was facilitating the specific crime of robbery.

## Prosecutorial Misconduct: Questioning of Witness Chesnoff

Attorney David Chesnoff testified that Israel called him soon after the Burtenshaw robbery and asked for advice. According to Chesnoff's testimony, the story Israel told Chesnoff was very similar to Israel's story at trial—some people overheard him talking about the Burtenshaws, robbed them, and were trying to force him to buy their jewelry. The State objected to Chesnoff's testimony on the basis that it merely related Israel's prior statements and was therefore self-serving hearsay. The trial court admitted the testimony over the State's objection.

During the State's cross-examination of Chesnoff, the prosecutor asked a number of questions to which Israel objected. Among these were questions regarding Chesnoff's antagonistic relationship with prosecutors in Nevada, accusations that he had acted unethically, and his representation of members of organized crime. The trial court allowed some of these questions and sustained objections to others. Israel did not move for a mistrial or curative instruction.

Israel now argues that he was denied a fair trial by the prosecutor's conduct during her cross-examination of Chesnoff and that the trial court abused its discretion by allowing irrelevant and prejudicial questions. "The law allows cross examination of a witness into matters that will affect credibility by showing bias, ill will, interest, or corruption." *State v. Russell*, 125 Wn.2d 24, 92, 882 P.2d 747 (1994). The scope of cross-examination is within the sound discretion of the trial court. "Where improper argument is charged, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments as well as their prejudicial effect." *Russell*, 125 Wn.2d at 85. Further, absent any request for a mistrial or curative instruction, we will not reverse unless the prosecutor's conduct was so prejudicial that no curative instruction could have obviated the prejudice. *Russell*, 125 Wn.2d at 85.

Although some of the prosecutor's questions were of questionable relevance and tested the limits of the trial court's rulings, we cannot say that they were so prejudicial as to require reversal. The fact that Israel's attorneys did not request a mistrial or curative instruction strongly suggests that the questions "did not appear critically prejudicial . . . in the context of the trial." *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990). Israel was represented by two experienced trial attorneys who either did not see the questioning as critically prejudicial in context, or chose to take their chances with the existing jury rather than move for a mistrial. Defendants in such a situation are not permitted to wait for the outcome of the trial and then obtain a new jury when the verdict is not in their favor. For this reason, Israel bears a heavy burden to show that the prosecutor's conduct denied him a fair trial, and reversal is not required if any prejudice could have been obviated by a curative instruction Israel did not request. *Russell*, 125 Wn.2d at 85. To the extent that Israel may have been prejudiced by the State's questioning of Chesnoff, it cannot be said that no instruction could have cured that prejudice. We therefore hold that the prosecutor's questioning of Chesnoff does not require reversal.

3. Issues Raised by King

Severance

Although the trial court granted King's motion to sever the counts pertaining to the Hwang robbery, King argues that the trial court erred in failing to sever the remaining counts from Israel's trial. This court reviews the trial court's denial of a severance motion for manifest abuse of discretion. *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991). Separate trials are not favored in Washington, and a defendant seeking severance has the burden of demonstrating that a joint trial will result in specific unfair prejudice, which outweighs the policy of judicial economy that is served by joint trials. *Hoffman*, 116 Wn.2d at 74;

*State v. McDonald*, 40 Wn. App. 743, 700 P.2d 327 (1985) (prejudice must be specific).

King has failed to show any specific prejudice resulting from his joint trial with Israel. King does not allege that their defenses were antagonistic or cite any evidence that was introduced against Israel that would not have been admissible against King in a separate trial.[18] Both King and Israel were charged with participation in the same criminal conspiracy, so the State was entitled to prove each crime in the alleged conspiracy against both defendants.

King argues that the evidence of the other crimes in the conspiracy were prior bad acts subject to analysis under ER 404(b). In a trial for conspiracy, however, each criminal act is directly relevant to prove the underlying conspiracy. *See* 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE, § 404.18, at 425 (4th ed. 1999) ("If the defendant is formally charged with conspiracy, Rule 404(b) does not restrict proof of the acts that are basis for the charge."). *See also United States v. Aranda*, 963 F.2d 211, 214 (8th Cir. 1992) (noting that where conspiracy is charged, "such evidence is not of 'other crimes,' but rather is evidence of the very crime charged"). Thus, every robbery to which Dorman and the other witnesses testified was admissible against both defendants for purposes of proving conspiracy liability, regardless of their individual participation. Absent a showing of specific prejudice to King's fair trial rights, the trial court properly denied severance.

## Vance Testimony

King argues that the trial court erred when it admitted the videotaped testimony of Brian Vance from King's 1997

---

[18] Even if King could point to some evidence introduced that would not have been admissible against him in a separate trial, "[t]he mere fact that evidence admissible against one defendant would not be admissible against a codefendant if the latter were tried alone does not necessitate severance[.]" *State v. Philips*, 108 Wn.2d 627, 640, 741 P.2d 24 (1987).

trial,[19] in which Vance indicated that King admitted to dropping a note at a robbery. We have already concluded that the trial court properly admitted Vance's testimony at the 1997 trial. King argues, however, that he was denied his right to confront Vance in the 1999 trial because he was unable to cross-examine him on questions related to the conspiracy charge. We disagree.

■ The videotape of Vance's testimony was hearsay. The court, however, correctly concluded that it was admissible under the exception for prior testimony under oath. If a declarant is unavailable to testify, the declarant's former testimony may be admitted, as long as the defendant "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." ER 804(b)(1). Vance was unavailable to testify at the second trial because he was deceased. Further, his prior testimony was under oath and subject to cross-examination. And although conspiracy was not at issue in the previous trial, ER 804(b)(1) does not require that the issues at the prior proceeding be identical. Rather, it merely requires that "the issues in the first proceeding, and hence the purpose for which the testimony was there offered, must have been such that the party against whom the testimony is later offered . . . had an adequate motive for testing the credibility of the testimony given in the earlier proceeding and offered in the later proceeding." 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 804.18, at 100 (4th ed. 1999). Here, King not only had adequate motive to cross-examine Vance at the prior proceeding, but his attorney in fact cross-examined Vance vigorously. Because the prior proceeding was a criminal trial and Vance's testimony was subject to cross-examination, we hold that the trial court did not abuse its discretion by admitting Vance's previous testimony.[20]

[19] King also argues that the trial court erred by introducing into evidence his 1997 conviction for the robbery of Mira Hwang. But that robbery occurred within the charging period for the conspiracy charge. Thus, as explained above, that crime was properly admissible to prove the underlying conspiracy.

[20] At oral argument, King's attorney asserted that Vance's testimony was admitted for the purpose of proving King's involvement in the conspiracy rather than his commission of the Hwang robbery. But even assuming this to be so, we

 Further, prior testimony is a firmly rooted exception to the hearsay rule, so the admissibility of Vance's statements under ER 804(b)(1) also satisfies the confrontation clause. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) (listing prior testimony as one of the "hearsay exceptions [that] rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.'" (quoting *Mattox v. United States*, 156 U.S. 237, 244, 15 S. Ct. 337, 39 L. Ed. 409 (1895))). *See also United States v. Kelly*, 892 F.2d 255, 262 (3d Cir. 1989) (holding prior testimony exception "firmly rooted" exception); *United States v. Salim*, 855 F.2d 944, 954-55 (2d Cir. 1988) (same).

## Statute of Limitations

 In his pro se brief, King argues that the trial court should have dismissed his case because the three-year statute of limitations had expired on the Burtenshaw robbery. The statute of limitations on a crime is tolled for any period of time during which the defendant is not "usually and publicly resident within this state." RCW 9A.04.080(2). It is undisputed that King lived in California for a period of time that, if tolled, allowed his prosecution within the statute of limitations. King argues that the statute of limitations should not have tolled while he was in California because he remained in contact with his Washington parole officer and paid restitution, thus subjecting himself continuously to the jurisdiction of the State. This court has previously held, however, that RCW 9A.04.080(2) unambiguously tolls the statute of limitations for a crime while a defendant is absent from Washington, regardless of whether the defendant has concealed himself or herself from Washington authorities. *State v. McDonald*, 100 Wn. App. 828, 832, 1 P.3d 1176 (2000), *cert. denied*, 534 U.S. 820

do not agree that the purpose for which the testimony was admitted controls its admissibility under ER 804(b)(1). As long as King was able to challenge the truth of Vance's statements by cross-examination, the rules of evidence and the confrontation clause are satisfied.

(2001). Thus, the trial court properly refused to dismiss the charges against King even though he stayed in contact with his Washington parole officer and paid restitution while living in California.

## King's Sentence

 King argues that the trial court erred in ordering him to serve consecutive, rather than concurrent, sentences. We disagree. The only sentences that the trial court ran consecutively were the two counts of first degree kidnapping. Under former RCW 9.94A.400(b) (2000), a sentencing court is required to run consecutively any sentences for "serious violent offenses." First degree kidnapping is a serious violent offense. RCW 9.94A.030(36)(a)(vi). Thus, the trial court was required to run the kidnapping counts consecutively. If King is convicted of those counts again on retrial, the trial court should again run his sentences consecutively in accordance with this statutory mandate.

 King also claims that the trial court erroneously calculated his offender score because the court failed to count all his crimes as the same criminal conduct. The trial court found that counts 17 and 18 (robbery and kidnapping of Angelina Burtenshaw), 19 and 20 (robbery and kidnapping of Jerry Burtenshaw), and 39 and 40 (robbery and assault of Mira Hwang) encompassed the same criminal conduct. The trial court did not find that the indecent liberties count against Mira Hwang was the same criminal conduct as the robbery and assault of Mira Hwang. A court's determination of whether crimes constitute the same criminal conduct is reviewed for abuse of discretion. *State v. Haddock*, 141 Wn.2d 103, 110, 3 P.3d 733 (2000).

 Former RCW 9.94A.400(1)(a) provides:

[I]f the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. . . . "Same criminal conduct," as used in this subsection, means two or

more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

Pursuant to this definition, the trial court correctly treated each crime involving a separate victim as separate criminal conduct for the purpose of former RCW 9.94A.400(1)(a) (2000), even though some of the crimes occurred at the same time and place.

 Further, the trial court properly treated the indecent liberties count committed against Hwang as separate from King's robbery and assault of Hwang, since the crime of indecent liberties requires different criminal intent. Whether two crimes involved the same criminal intent, for purposes of former RCW 9.94A.400(1)(a), is measured by determining whether the defendant's criminal intent, viewed objectively, changed from one crime to the other. *State v. Walden*, 69 Wn. App. 183, 187-88, 847 P.2d 956 (1993). Objective intent may be determined by examining whether one crime furthered the other or whether both crimes were a part of a recognizable scheme or plan. *State v. Lewis*, 115 Wn.2d 294, 302, 797 P.2d 1141 (1990). The objective intent for King's indecent liberties (sexual gratification) is much different than the objective criminal intent of robbery (economic enrichment). The trial court, therefore, did not abuse its discretion in finding that the indecent liberties count was separate criminal conduct from the robbery and kidnapping counts. King's sentence with regard to those counts is affirmed.

4. Issues Raised by the State's Appeal (Israel only)

New Trial

After the conclusion of the 1999 trial, the trial court granted in part Israel's motion for a new trial on the basis of newly discovered evidence. The State argues that the trial court abused its discretion in granting a new trial on the substantive robbery and kidnapping charges. Because we have determined that those convictions must be re-

versed on other bases, we need not address the State's argument on this issue. We do, however, need to address Israel's counterargument that the trial court should have also granted a new trial on the conspiracy and money laundering charges.

 ██ Under CrR 7.5(a)(3), the court may grant a new trial based on newly discovered, material evidence that could not have been discovered with reasonable diligence and produced at trial. A new trial should not be granted on this ground unless the moving party demonstrates that the evidence "will probably change the result of the trial." *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981). The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will be overturned only for an abuse of that discretion. A much stronger abuse of discretion will ordinarily be required to set aside an order granting a new trial than one denying a new trial. *State v. Brent*, 30 Wn.2d 286, 290, 191 P.2d 682 (1948).

The evidence offered by Israel in his motion for new trial was as follows. After the jury returned its verdicts, James Polack, a longtime friend of Israel, contacted Israel's attorneys and advised them that Brad Shain had admitted to lying at Israel's trial. At the trial, Israel testified that Shain was present when Bryant threatened the lives of Israel and his family and that Bryant threatened to "pin" the Burtenshaw robbery on Israel if Israel did not pay him. Shain testified and denied being present during any such conversation. At a posttrial hearing, Polack testified that he met with Shain after the trial and Shain admitted that he had been present when Bryant threatened to go to the police and implicate Israel unless Israel paid him. Shain testified at the hearing and once again denied being present during the conversations between Bryant and Israel and denied making any contrary statements to Polack after the trial.

Israel also introduced evidence that after the trial, *Seattle Times* reporter Ian Ith received a letter signed with the name "Vincent Bryant," asserting generally that Bryant

had information that would "prove that Mr. David Israel is not guilty as charged."[21] Bryant also called Israel's attorney, Gary Dubcoff, and again asserted in general terms that Israel was innocent.[22] Bryant called back, but Israel's attorneys told him that Bryant's attorney had requested that they not speak to him and that Bryant could tell the judge at a hearing. Tape recordings of these conversations were introduced at the hearing, but Bryant asserted his Fifth Amendment privilege against self-incrimination, and he would not say whether he wrote the letter to Ian Ith or expound on the information he had earlier claimed to have regarding Israel's innocence. The trial judge found that Bryant had written the letter and made the two calls to Dubcoff, and that "[g]iven the context of the trial and the totality of the circumstances, the Court finds . . . it is probable that such evidence would change the result of the trial as to Counts 17, 18, 19 and 20."

---

[21] The text of Bryant's letter to the *Seattle Times* was as follows:

Dear Mr. Ian Ith

Let me properly introduce my self, my name is Vincent Bryant.

The reason for this letter is your article, dated June 12, 1999, on David Israel, who was convicted of robbery and kidnapping. His sentencing is June 30th due to postponed [sic].

I have information that would prove that Mr. David Israel is not guilty as charged. Please have his attorney get in touch with me A.S.A.P. I will gladly inform you of the new evidence that will clear David Israel.

Thank you, Vincent Bryant.

[22] The most relevant portion of Bryant's tape-recorded telephone conversation is as follows:

BRYANT: [T]he prosecution, they're claiming that without Brad Shane's testimony, they still had David Israel, you know pretty much locked. Cause that's not true. Okay. David is claiming, you know, well, he was forced into doing this.

DUBCOFF: Not quite.

BRYANT: Well, from what I heard, they're saying that he was being extorted . . . .

DUBCOFF: Yeah, that's true.

BRYANT: Okay. And Brad said, you know, from what I heard, that, you know, none of this, that didn't happen. And now he's trying to, you know, go back in court and tell Judge Mertel or somebody is trying to tell Mertel that, yes, you know, it did happen. And I just want to backup that, you know, I just want to backup some things. . . .

 Israel argues that this new evidence not only justified the court's grant of a new trial on the robbery and kidnapping counts, but also compelled a new trial on the money laundering and conspiracy counts. We disagree. As Israel acknowledges, Polack's testimony was offered for the sole purpose of impeaching the testimony of Brad Shain, so as a matter of law that evidence is insufficient to warrant a new trial. *State v. Edwards*, 23 Wn. App. 893, 898, 600 P.2d 566 (1979) (citing *State v. Fairbanks*, 25 Wn.2d 686, 171 P.2d 845 (1946)). Further, although we need not decide the issue, we note that it is highly questionable whether Bryant's conclusory statements were sufficient to justify a new trial on any of the charged counts. At any rate, we are certainly not convinced that this evidence compelled a new trial on the remaining counts.

Israel argues that it is "impossible to reconcile" the trial court's grant of a new trial on the robbery and kidnapping counts with the court's refusal to order a new trial for conspiracy and money laundering. But all the new evidence dealt specifically with Israel's involvement in the Burtenshaw robbery, not with any of the other robberies in the alleged conspiracy. The only substantive robbery and kidnapping charges against Israel were those arising out of the Burtenshaw robbery. Thus, the trial court did not abuse its discretion in determining that the evidence was less likely to change the outcome with regard to the conspiracy and money laundering charges than with regard to the substantive robbery and kidnapping charges.

## Restitution

 The State argues that the trial court erred when it failed to order Israel to pay restitution to two victims of the conspiracy. Former RCW 9.94A.142(2) (2000) states:

> Restitution shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property . . . unless extraordinary circumstances exist which make restitution inappropriate in the

court's judgment and the court sets forth such circumstances in the record.

The restitution statute is to be interpreted broadly to carry out the Legislature's intention. *State v. Hennings*, 129 Wn.2d 512, 519, 919 P.2d 580 (1996). Thus, "the trial court need only find that a victim's injuries were causally connected to a defendant's crime before ordering a defendant to pay restitution for the expenses which resulted." *State v. Enstone*, 137 Wn.2d 675, 682, 974 P.2d 828 (1999) (holding foreseeability of injury not required). A trial court's decision with regard to restitution is reviewed for abuse of discretion. *Enstone*, 137 Wn.2d at 679. A trial court abuses its discretion when its decision rests on an untenable basis. *Enstone*, 137 Wn.2d at 679-80.

A. Beverly Rhoades

Beverly Rhoades was a victim of the first robbery alleged to have occurred during the conspiracy, committed October 23, 1993. According to Dorman's testimony, the first time he saw Israel was the day after the Rhoades robbery. There was no other evidence of Israel's involvement in the conspiracy before that point. Israel argues that the trial court properly refused to order restitution for Beverly Rhoades because there was no evidence that he had joined the conspiracy prior to that robbery.

The State argues that once the conspiracy had been proven, the restitution statute required the court to order restitution for any injury resulting from the charged conspiracy, regardless of whether the crime was committed before the defendant joined the conspiracy. We agree. The trial court apparently based its decision denying restitution to Rhoades on the legal conclusion that Israel could not be responsible for robberies committed before he joined the conspiracy. But the restitution statute is to be interpreted broadly. *Hennings*, 129 Wn.2d at 519. And although under *Stein*, Israel could not be convicted of substantive crimes committed before he joined the conspiracy, the scope of his liability for the conspiracy itself is broader: one who joins an existing conspiracy is generally held to adopt the prior

statements and actions of his coconspirators for purposes of conspiracy liability. *See* 4 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 685, at 563 (15th ed. 1996). Likewise, the restitution statute sweeps far more broadly than the accomplice liability statute, requiring neither knowledge nor foreseeability of the injury, but merely a causal relationship. *Enstone*, 137 Wn.2d at 682. Accordingly, we hold that one convicted of a conspiracy should be ordered to pay restitution for any injuries caused by the conspiracy, regardless of the defendant's knowledge or complicity in the particular injury. The trial court's decision to deny restitution to Beverly Rhoades therefore rests on an untenable basis and must be reversed.

B. Jill Bucy

Jill Bucy was robbed after the Burtenshaw robbery, but within the charging period for the conspiracy. The trial court reduced the amount of restitution ordered for Bucy by $1,050 based on "lack of causation." These costs had been requested to reimburse Bucy for clothing damaged during the robbery and four sessions with her therapist around the time of trial. Israel argues that the court's reasoning was justified because of the unforeseeability of the sexual assaults she suffered at the hands of her assailants. But as we have noted, foreseeability of the injury is not necessary, only a causal relationship. *Enstone*, 137 Wn.2d at 682. Further, clothing destroyed during the commission of the crime is clearly within the scope of the restitution statute. King, who by all accounts was not present at the Bucy robbery, was ordered to pay restitution to Bucy. Accordingly, we can find no tenable reason for the trial court's decision to subtract these costs from Israel's restitution, and on remand, the trial court shall order Israel to pay them.[23]

---

[23] Israel argues that the trial court should not have ordered any restitution at all because the jury's verdict did not indicate at what point Israel joined the conspiracy. Accordingly, Israel argues that the trial court invaded the province of the jury when it determined, for purposes of sentencing, the point at which Israel joined the conspiracy. But we have concluded that Israel should be ordered to pay

## CONCLUSION

Israel's convictions for money laundering and criminal conspiracy are affirmed. Israel's sentence is remanded for an award of additional restitution, consistent with this opinion, to Jill Bucy and Beverly Rhoades. We also affirm King's 1997 convictions as well as King's 1999 conspiracy conviction.

We reverse Israel's convictions for first degree robbery and remand for a new trial because the court's instructions allowed the jury to convict him regardless of whether he had knowledge of that specific crime. For the same reason, King's convictions for first degree robbery and kidnapping are reversed and remanded for a new trial. We dismiss Israel's conviction for first degree kidnapping because it was not supported by sufficient evidence.

Affirmed in part, reversed in part, and remanded.

Cox, A.C.J., and ELLINGTON, J., concur.

Reconsideration denied October 4, 2002.

Review denied at 149 Wn.2d 1013 and 1015 (2003).

restitution for any injury caused by the conspiracy, regardless of whether the injury occurred before Israel joined. Therefore, we need not reach this argument.